# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jane Doe

**DEFENDANTS**

Berlin Bd. of Education, Denis Parsons, and Brian Benigni

**(b)** County of Residence of First Listed Plaintiff   Hartford
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Hartford
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Patrick J. Sweeney, SWEENEY LAW FIRM, 77 Wall Street Ste. 1-W, Madison, CT 06443; (203) 244-9522

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [X] 3   Federal Question
*(U.S. Government Not a Party)*
- [ ] 2   U.S. Government Defendant
- [ ] 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other<br><br>**LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[X] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016<br><br>**SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g)) | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 USC 2612, et seq, and 42 USC 1983

Brief description of cause:
unlawful retaliation for exercise of FMLA rights, selective enforcement violation of Equal Protection Clause, and related state law torts.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**   TBD

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   March 26, 2021

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANE DOE,<br><br>        Plaintiff,<br><br>        v.<br><br>BERLIN BOARD OF EDUCATION,<br>DENISE PARSONS, and BRIAN BENIGNI,<br>the individuals being named in their personal<br>and official capacities,<br><br>        Defendants. | Civil Action No.: |

## **COMPLAINT**

1.      Plaintiff Jane Doe ("Ms. Doe") brings this lawsuit against Defendants Berlin Board of Education ("Board"), Denise Parsons ("Parsons"), and Brian Benigni ("Benigni") (collectively, "Defendants"), based upon their violations of Ms. Doe's rights and liberties otherwise secured to her by the Family Medical Leave Act, 29 U.S.C. § 2612, *et seq.* ("FMLA"), the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), the Fourteenth Amendment to the United States Constitution ("Equal Protection Clause"), and related constitutional, common, and statutory laws of the State of Connecticut.

## **PRELIMINARY STATEMENT**

2.      This action is about the outrageous and illegal conduct of Defendant Board and its officials in their scheme to retaliate against Plaintiff Ms. Doe for exercising her federally-secured right to medical leave.

3.      The conduct, itself, was a violation of the FMLA.  The cover-up—which included their selective enforcement of the FMLA against Ms. Doe—was an egregious denial of Ms. Doe's right to equal protection of the law.

4.     More insidiously, Defendant Board's conduct was part of its broader campaign to send a message to similarly situated employees—with whom it knew Ms. Doe was meeting and conferring—to discourage those employees from exercising their federally-secured rights. Those employees, in turn, would be expected to pass the message along to other employees, and so forth. Human resource experts call it the "grapevine effect."

*     *     *

5.     When Ms. Doe called Defendant Board to inquire about the status of her complete *and properly certified* request for FMLA leave, Defendant Parsons—the Board's Director of Human Resources—personally dressed her down.  As set forth more fully below, Defendant Parsons verbally abused, mocked, and demeaned Ms. Doe, calling her a liar and a fraud.

6.     Ms. Doe did not demur.  She challenged Defendant Parsons' very specific, very untrue factual premise: that Ms. Doe had previously made an application for leave based upon childcare needs, which the Board denied ("Childcare Pretext").

7.     The Childcare Pretext was untrue.

8.     Defendant Parsons specifically acknowledged her error, began to suggest that it was immaterial, took a pregnant pause, then exploded:

> I have over three hundred teachers.  And I cannot have them thinking they could go get letters like this[1] to not have to come back to work.  I will not be approving your leave.

*See* August 14, 2020 Episode, defined below at ¶¶ 99-126.

9.     Thereafter, Defendants would not grant FMLA leave to Ms. Doe—*despite her proper medical certification*—without requiring her, first, to submit to a mental health examination by the Board's own Doctor at the Institute of Living in Hartford ("Second Opinion Exam").

---

[1] Referring to Ms. Doe's medical certification.

10.    However, without a <u>legitimate</u> reason to doubt a medical certification, an employer is not allowed to withhold FMLA rights by requiring submission to a Second Opinion Exam.

11.    Here, Defendant Parsons already announced Defendant Board's very <u>illegitimate</u> reason for challenging Ms. Doe's otherwise proper medical certification ("I have over three hundred teachers!"), and acknowledged the falsity of the Childcare Pretext.

12.    At or about this time, Defendant Parsons transitioned from an agenda of *discouraging* Ms. Doe from exercising her FMLA rights—through verbal abuse and shame—to *retaliating* against Ms. Doe for exercising those rights.

13.    Simultaneously, Defendant Parsons was fearful about a flood of requests for leave from her District Staff ("I have over three hundred teachers!").

14.    Defendant Parsons already expressed her belief that, somehow, her response to Ms. Doe's request for leave would affect the rest of her District Staff's "thinking" about their own ability to take leave ("I cannot have them thinking that they could go get letters like this to not have to come back to work.").

15.    Defendant Parsons believed that effective retaliation against Ms. Doe for exercising her rights would discourage the rest of her District Staff from requesting leave in the first instance, or pursuing it thereafter.

16.    Because Defendant Parsons had just learned two things about Ms. Doe, she believed Ms. Doe would make a perfect target:

     a.  Ms. Doe was outspoken among her colleagues, having volunteered to approach Defendant Parsons in the first instance, on their behalf, to inquire about leave policy for several similarly situated District Staff members; and

     b.  Ms. Doe's request for medical leave was based upon her hidden mental health condition (although Defendant Parsons did not know about—or care about—the severity of the condition).

17.     Defendant Parsons hoped and expected that the story of how she treated Ms. Doe could and would travel—through the "grapevine effect"—among the Griswold Staff and across the District.

18.     More deviously, Defendant Parsons thought that Ms. Doe's "invisible disability" could provide Defendants with ample cover for declining to grant her request for leave in the first instance, which was otherwise complete and properly certified.

*     *     *

19.     Horrified but resolved, Ms. Doe agreed to submit to a Second Opinion Exam.

20.     The personal cost to Ms. Doe was tremendous. As consideration for her exercise of her federal right, Ms. Doe was: (i) humiliated and demeaned; (ii) denied the dignity of self-managing her hidden health condition in private; and (iii) forced to submit to a mental health examination in which, for the first time in her life, she had to *involuntarily* divulge her private and personal history of her mental health condition and related traumas, *going back to the age of twelve*.

21.     Ms. Doe was under the impression that Defendants were (i) also acting in good faith and (ii) within their legal rights to require a Second Opinion Exam.

22.     Ms. Doe was wrong on both counts.  At that time, Ms. Doe did not fully comprehend, the depth and degree of Defendant Parsons' personal animus, malice, and/or disregard for her rights, which would only be revealed the following week, at the Second Opinion Exam.

23.     At the Second Opinion Exam, as the first order of business, the Board's Doctor stated that Ms. Doe was "on his couch" that day because she had made a request for leave based on childcare, which request was denied.

24.     Ms. Doe was stunned.  It was the Childcare Pretext, the false pretext that Defendant Parsons uttered during the August 14, 2020 Episode, only to be immediately and forcefully refuted.

25.     Defendant Parsons had acknowledged that she was wrong, admitting that Ms. Doe, in fact, did _not_ request childcare leave.  But the lie had survived and taken on a life of its own.

26.     If the Childcare Pretext was the product of a good faith misunderstanding on August 14, 2020 (which is not conceded here), two weeks later, at the Second Opinion Exam, it had transmogrified into an expedient, unvarnished, and hurtful lie.

27.     The false Childcare Pretext also conclusively establishes Defendants' bad-faith, malice, and ill-will towards Ms. Doe and/or their reckless disregard for her rights.

28.     Ms. Doe suffered and continues to suffer from severe mental, psychic, and emotional distress and trauma as a result of Defendants' conduct described herein, as well as economic damages.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over the causes herein pursuant to 28 U.S.C. § 1331 ("Federal question"), 28. U.S.C. § 1343 ("Civil rights and elective franchise"), and 28. U.S.C. § 1367 ("Supplemental jurisdiction").  The claims on which original jurisdiction is based (FMLA, Section 1983, and the Equal Protection Clause) predominate over the state law claims (common law, statutory and, constitutional torts) which form part of the same case or controversy, but which are neither novel, nor complex.

30.     Venue is proper because Ms. Doe is a citizen of Connecticut.

## PARTIES

31.     Plaintiff Jane Doe is a natural person and a resident of Rocky Hill, Connecticut. She commences this action with a pseudonym, consistent with decisional law permitting a party

to proceed as such, where, among other things, (i) the subject matter is highly sensitive and of a personal nature and (ii) at the crux of the claim, as here, is the forced disclosure of said matter. *See Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185 (2d Cir. 2008) and *Sealed* Declaration of Jane Doe in Support of Motion to Proceed with Pseudonym, sworn to March 26, 2021 ("Sealed Doe Declaration"), and on file herein with the Clerk of Court.

32.     Defendant Berlin Board of Education ("Board") is an administrative agency of the Town of Berlin, Connecticut, a political subdivision of the State of Connecticut, and a public agency subject to the FMLA.  Its business address is 238 Kensington Road, Berlin, Connecticut.

33.     Denise Parsons is a natural person, having a business address at 238 Kensington Road, Berlin, Connecticut.   Defendant Parsons is the Board's Director of Human Resources.  She is being sued here both in her official capacity and her individual capacity.

34.     Brian Benigni is a natural person, having a business address at 238 Kensington Road, Berlin, Connecticut.  Defendant Benigni is the Board's Superintendent of Schools.  He is being sued here both in his official capacity and his individual capacity.

35.     For all purposes alleged herein, each of the individual defendants was acting under color of law and therefore considered a state actor for purposes of 42 U.S.C. § 1983.

### BACKGROUND

36.     Plaintiff Jane Doe grew up in Windsor, Connecticut.

37.     After graduating from Windsor High School, Ms. Doe attended Central Connecticut State University ("C.C.S.U.).

38.     In 2013, Ms. Doe graduated from C.C.S.U. with a Bachelor of Science degree in Education.

39.     Beginning in August 2013, and continuing up to the events alleged herein, Ms. Doe was employed by Defendant Berlin Board of Education as a classroom teacher at the Mary E. Griswold Elementary School ("Griswold Elementary"), one of five schools in the Town of Berlin's school district ("District"), which is co-extensive with the town, itself.

40.     During her seven (7) years of dedicated service to Griswold Elementary and the District, Ms. Doe garnered the praise of her students, parents, colleagues, and supervisors.

41.     For Ms. Doe, her biggest achievement was the trust she had worked so hard to earn and to keep, the trust of her employer, her colleagues, and the public trust: she was responsible for the health, safety, and well-being of dozens of the Town of Berlin's minor children on any given day.  It was her dream job.

42.     She excelled at her job and was known throughout Griswold Elementary and the District for her outspoken participation and leadership in promoting the core values of the school. Recently she and her students received District-wide recognition for an anti-bullying program she developed at Griswold Elementary.

43.     She did so while pursuing a master's degree in special education at the University of Hartford and raising her own elementary school-age daughter who attended public school in her home district.

*       *       *

44.     Ms. Doe also did all of the foregoing while successfully and privately managing a hidden mental health condition, with which she was diagnosed over twenty (20) years ago.

45.     Ms. Doe never claimed disability or requested accommodation for her condition.

46.     In fact, to the best of Ms. Doe's knowledge, no employer—indeed, no one outside her close group of confidants—knew about her condition.  Ms. Doe is a proud and private person.

47. In this instance, the FMLA should have provided her the right to medical leave in order to permit her the dignity of self-managing her condition—*without* accommodations—and to do so in private.

48. After the incidents alleged herein—the animus and evident mishandling and illegal disclosure of confidential medical information—Ms. Doe is even more resolved to (re)claim the right that should have been secured to her by the FMLA:

> *The right to self-manage her own medical condition, without unnecessary, illegitimate, and/or retaliatory invasion of her privacy by her employer.*

49. Ms. Doe's attendance record during the entirety of her Board employment was well within normal parameters under the District's leave of absence policy ("District Leave Policy").

### TUESDAY JULY 29, 2020
### MEETING OF GRISWOLD ELEMENTARY STAFF AND ADMINISTRATORS

50. The Board had not yet announced its plan for re-opening in August 2020, in light of the ongoing health concerns associated with the coronavirus.

51. The State of Connecticut announced that each of its 166 local school districts would make its own respective decision regarding re-opening, whether it be with "in-person instruction," "remote instruction," or some hybrid thereof.

52. The District's Superintendent of Schools, Defendant Benigni, was preparing to take a vacation.

\*       \*       \*

53. On July 29, 2020, Ms. Doe attended a meeting of Griswold Elementary certified teacher staff ("Griswold Staff") and administrative staff ("Administrators") to discuss the District's proposed plans for re-opening. There were no meetings, at that time, of certified teacher staff for the entire District ("District Staff").

54.     During and/or appurtenant to the July 29, 2020 meeting, Ms. Doe and a number of other Griswold Staff identified themselves as classroom teachers (i) who resided outside the District (ii) were the primary caregiver for elementary-age child(ren) (iii) who attended school in their respective home districts ("Non-Resident Teacher/Caregivers").

55.     The Non-Resident Teacher/Caregivers shared questions and concerns about the possibility that (i) the District and/or Griswold Elementary would re-open for "in-person instruction," and (ii) their home school districts would <u>not</u> re-open for "in-person instruction."  In that case, those individuals would need to be at home to care for their child(ren) and would necessarily not be able to perform the duties of their jobs for the Board, *if those duties included "in-person instruction."*

56.     The Non-Resident Teacher/Caregivers were concerned about the Board's treatment of such absences under the District Leave Policy, FMLA, and/or other leave benefits that may be provided on an emergency basis.  This was not a concern for Griswold Staff (or District Staff) who resided in the District or were not a primary caregiver for a young child.  Otherwise, all District Staff were reasonably similarly situated for most purposes herein.

57.     Ms. Doe volunteered to speak with the Board's Human Resources Department about the Non-Resident Teacher/Caregivers' concerns, and report back.

### WEDNESDAY JULY 30, 2020
### INQUIRY ABOUT DISTRICT LEAVE POLICY/FMLA

58.     On July 30, 2020, Ms. Doe called the Board's Human Resources Department and spoke with Defendant Parsons, the Director of Human Resources for the entire District.

59.     Among other things, Ms. Doe expressed the concerns of her and the other Non-Resident Teacher/Caregivers.

60.     Among other things, Ms. Doe asked how the Board would consider any absence necessitated by their child(ren) attending school in one of their home school districts that would require "remote instruction," instead of the "in-person instruction."

61.     Defendant Parsons knew that Ms. Doe made her inquiry on July 30, 2020 for herself, *and on behalf of other similarly situated individuals*, because (i) Ms. Doe told her as much during the course of the conversation and (ii) Ms. Doe repeatedly used the pronouns "we" and "our" throughout the conversation.

62.     Defendant Parsons must have understood Ms. Doe's putative constituents to have been the Non-Resident Teacher/Caregivers, the Griswold Staff, and/or the District Staff <u>and</u> known that Ms. Doe would be attending the union meeting of the Griswold Staff that afternoon.

63.     At that time, Defendant Parsons did not know about Ms. Doe's hidden mental health condition.

64.     Defendant Parsons acknowledged the Non-Resident Teacher/Caregiver questions/issues and indicated that, with new information being received on a daily basis, she was unable to provide an answer at the time.

65.     Defendant Parsons indicated that she would respond with an answer at a later time. Defendant Parsons did not respond later, or at any time.

\*      \*      \*

66.     On that day, July 30, 2020, Ms. Doe assuredly did <u>not</u> make any request for leave of absence, for any reason whatsoever.

67.     Defendant Parsons knew that Ms. Doe did <u>not</u> make any request for leave on July 30, 2020.

68. Thereafter, non-party Jane Doe No. 2, another Non-Resident Teacher/Caregiver, contacted Defendant Parsons and expressed the same concerns Ms. Doe had expressed on their behalf.

69. Defendant Parsons acknowledged Jane Doe No. 2's concerns and advised her that another Non-Resident Teacher/Caregiver had also contacted her about the same concerns.

70. Defendant Parsons stated to Jane Doe No. 2 that she knew that many similarly situated employees shared the same concerns and that she was "making a list" of those people.

### FRIDAY AUGUST 7, 2020
### REQUEST FOR FMLA LEAVE

71. On Friday August 7, 2020 at 12:12 PM, Ms. Doe emailed Defendant Parsons stating that she needed to know what to do in order to take leave under the FMLA. Ms. Doe advised, at that time, that the leave would be for "personal medical reasons." ("Request for Leave").

72. On Sunday August 9, 2020, Defendant Parsons responded to Ms. Doe, adding non-party Nicole Damiata to the email chain, advising that she managed requests for FMLA leave, and indicating that she would provide Ms. Doe the requested information.

73. Monday morning, Ms. Damiata emailed Ms. Doe and inquired about (i) the reason for the Request for Leave, (ii) the start date of the requested leave, and (iii) the end date of the requested leave.

74. Ms. Doe immediately answered (for the second time) that the reason for the leave would be "medical reasons," and further, that the duration would be from August through October with the expected return being the first week of November.

75. Ms. Damiata responded by sending Ms. Doe a blank FMLA medical certification form (WH-380-E) to be completed, certified as necessary, and returned.

76. Ms. Damiata further stated, once the Board received the medical certification, they would review the Request for Leave and advise Ms. Doe whether it was approved.

77. Ms. Damiata did not provide Ms. Doe with any other written material at that point, nor did she orally advise Ms. Doe of her rights under the FMLA.

78. For her part, over the course of the next week, Ms. Doe inquired repeatedly about her rights and obligations under the FMLA.

### WEDNESDAY AUGUST 12, 2020
### RETURN OF THE MEDICAL CERTIFICATION

79. On Wednesday, August 12, 2020, Ms. Doe returned the completed medical certification to Ms. Damiata. Annexed hereto as <u>Exhibit A</u> is a true and correct copy of Ms. Doe's medical certification in support of her Request for Leave ("Medical Certification"), redacted.

80. That evening, after 9:30 PM, Ms. Damiata forwarded the Medical Certification to Defendant Parsons.

81. For her boss, Ms. Damiata's cover email summarized the certified health condition described in the Medical Certification with her own one-word, diminutive: "anxiety." She then invited Defendant Parsons to comment.

82. Defendant Parsons was also working late hours that week, with school scheduled to reopen in a little more than two weeks (and with both Ms. Damiata and Defendant Benigni on vacation).

83. Defendant Parsons and Ms. Damiata had already flagged Ms. Doe's then-pending Request for Leave as a potentially big problem for their staffing objectives.

84. Defendant Parsons responded that evening to Ms. Damiata and/or communicated with other interested parties about the matter.

85. The record of any such correspondence has been withheld or destroyed. *See infra.*, at ¶¶ 236-44; *Fifth Cause of Action* ("Intentional Spoliation of Evidence"), seeking monetary damage under Connecticut common law.

## THURSDAY AUGUST 13, 2020

86. Shortly after 9:00 A.M. on Thursday August 13, 2020, Defendant Parsons received a call from Ms. Jane Doe No. 3.

87. Ms. Doe No. 3 was also a member of the Griswold Staff and a Non-Resident Teacher/Caregiver who was, or believed that she may have been, eligible for FMLA leave.

88. Ms. Doe No. 3 spoke to Defendant Parsons and asked for information about and/or requested leave of absence for childcare purposes.

89. Ms. Doe No. 3 then called Ms. Damiata and requested FMLA paper work.

90. Defendant Parsons reported the foregoing in an email to non-party David Kitzman, principal of Griswold Elementary and Plaintiff Jane Doe's direct supervisor ("Principal Kitzman"), who was also the direct supervisor of non-party Jane Doe No. 3.[2]

91. In that email, Defendant Parsons noted to Principal Kitzman that non-party Jane Doe No. 3 also made a request for FMLA leave "for a personal medical condition… same request as [Plaintiff Jane Doe]."

\*    \*    \*

92. During the pendency of Ms. Doe's properly-certified Request for Leave, Defendant Parsons became aware of, and anticipated, other teacher requests for leave (FMLA and otherwise).

---

[2] Defendant Board produced the Parsons-Kitzman August 13, 2020 Email Exchange as part of Plaintiff Jane Doe's "personnel records," in response to a Freedom of Information Act ("FOIA") request, discussed below. The email concerns Plaintiff Jane Doe and also references *without redaction* another member of Griswold Staff who "requested the FMLA paper work from Nicole [Damiata] for a personal medical condition (same request as [Plaintiff Jane Doe])." The presence of this unredacted document regarding non-party Jane Doe No. 3 in Plaintiff Jane Doe's "personnel records," in part, is the basis for the injunctive relief requested herein.

93.     Defendant Parsons became deeply concerned that requests for leave (under the FMLA and/or otherwise) would threaten her staffing objectives for school re-opening, scheduled to occur in less than three weeks.

94.     That evening, there was a meeting of the Administrative Counsel which is comprised of the Superintendent of Schools (Defendant Benigni), the Director of Human Resources (Defendant Parsons), and the District's five school principals.

95.     Prior to the meeting, Defendant Parsons and Ms. Damiata approached the Board's attorney to express their concerns about Plaintiff Jane Doe and their conviction that she should be made to submit to a Second Opinion Exam.

96.     The Board's attorney provided some counsel, but indicated that he would have to do some research and get back to them.

97.     Upon information and belief, thereafter, Defendant Parsons addressed the Administrative Counsel with her concerns about District Staff requesting leaves of absence, and staffing concerns for each of the schools in the District, advising them as to her various plans and strategies for ensuring appropriate staffing levels.

98.     Upon information and belief, Defendant Parsons reported to the Administrative Counsel on, among other things, her personal, growing concern about requests for leave from District Staff.

**FRIDAY AUGUST 14, 2020**

99.     On Friday August 14, 2020, it had been one week (and five business days) since Ms. Doe made her Request for Leave for personal medical reasons.

100.    In that time, the Board posted a job listing for a long-term substitute ("LTS") for Ms. Doe's classroom, *yet Ms. Doe had not received a response to the Request for Leave or any written information from the Board advising her of her rights under the FMLA*.

101.    The Board also posted a job listing for an LTS for another classroom at Griswold Elementary for the same grade-level as Ms. Doe's class.

*        *        *

102.    Ms. Doe was physically at Griswold Elementary, unpacking her classroom and intending to speak with her direct supervisor Principal Kitzman in person to discuss her anticipated absence.

103.    Ms. Doe called Defendant Parsons, who answered the phone.  She and Ms. Doe spoke.

104.    Given her reasonable fear of contempt and derision for seeking medical leave, Ms. Doe was actually relieved to be speaking with the Director of Human Resources, herself.

105.    Ms. Doe noted the public listing for her job, asked Ms. Parsons about the status of her Request for Leave, and asked if there was anything more that they needed from her to make a decision on her Request for Leave.

106.    Defendant Parsons stated that she did not believe that the Medical Certification was legitimate.

107.    Defendant Parsons stated that she did not believe that Ms. Doe had the medical condition identified on the Medical Certification.

108.    Yet, Defendant Parsons had no legitimate reason to doubt the Medical Certification.

109.    Ms. Doe protested that Defendant Parsons did not have the right to question her mental health condition and diagnosis.  If Ms. Doe had an obvious and/or unmanaged medical

condition temporarily preventing her from performing her job, Defendant would not have been so callous and quick to doubt the validity of the certification.[3]  Ms. Doe was stunned.

110.    Defendant Parsons knew or should have known that Ms. Doe, at or around that moment, was experiencing a debilitating panic episode as identified on the Medical Certification.

### THE FALSE CHILDCARE PRETEXT

111.    Defendant stated that she thought Ms. Doe contrived her request and the condition on which it was based <u>only</u> after requesting the same leave for childcare purposes, and being denied.

112.    Ms. Doe could not believe what she was hearing.  She never made a request for childcare leave and was denied; she only called to inquire about all of the leave options for her and a group of similarly situated teachers.

113.    She challenged Defendant Parsons, who quickly corrected herself, and admitted that Ms. Doe had not requested childcare leave.

### "I have over three hundred teachers!"

114.    Defendant Parsons continued, yelling now and employing a tone implying/suggesting personal pique:

> I have over three hundred teachers.  And I cannot have them thinking they could go get letters like this, to not have to come back to work.  I [personally] will not be approving your leave.  And I will be sending it to [Defendant Benigni] for his review upon his return from vacation.

115.    Ms. Doe was still speechless, traumatized.

---

[3] If Bartleby the Scrivener appeared at the office with casts on both hands and a facially unimpeachable medical certification from his doctor stating that he could not be a scribe for 8 weeks, his employer might still have "reason to doubt" the certification, e.g., Bartley's *personal* history of passively declining to work ("I would prefer not to."). Even then, a reasonable employer—acting in good faith—would avail itself of its options within the strict regulatory proscriptions for clarification and authentication. Here, Ms. Doe had no history which could suggest she <u>ever</u> tried to avoid work; in fact, she sought out work and volunteered routinely.  *And the Board <u>never</u> sought out Clarification/Authentication*.

116. Two days earlier, Ms. Doe had revealed to Defendants—in strict confidence—a long-standing hidden mental health condition.

117. Now, the Director of Human Resources was threatening to disclose Ms. Doe's confidential matters to the Superintendent of Schools and, most horrifyingly, to Ms. Doe's peers and colleagues ("Disclosure Threats") as some kind of warning to them.

\*     \*     \*

118. Prior to making her Request for Leave, Ms. Doe had several fears and reservations about revealing her hidden mental health condition, three of which were as follows.

119. <u>First</u>, Ms. Doe reasonably feared disbelief, contempt, and derision, but assured herself that she would be protected from such conduct by any one of the following:

    a. federal and state labor laws;

    b. federal and state medical privacy laws;

    c. the rights of privacy and fundamental fairness (due process) she understood to be secured by the federal and state constitutions; and

    d. standards of common decency in a civilized society, and in a public elementary school.

120. Ms. Doe's fear of disbelief, contempt, and derision came to pass in unexpectedly dramatic fashion, as Defendant Parsons recklessly violated Ms. Doe's rights under those laws and standards of public decency, *in order that they not interfere with her own staffing objectives*.

121. <u>Second</u>, Ms. Doe reasonably feared disclosure and stigmatization.

122. Defendant Parsons certainly stoked that fear with her Disclosure Threats.

123. <u>Third</u>, Ms. Doe reasonably feared that the disclosure to her employer of her hidden condition—which she had self-managed and kept completely private—would deprive her of the dignity of self-managing her condition in the future *without the need for accommodations*.

124.    The only employer "accommodation" Ms. Doe needed in August 2020 was the ability to exercise her FMLA right to medical leave, unimpeded.

125.    Failure of that "accommodation," as it actually happened, means that Ms. Doe may still be unable, *at least in this particular school district*, to continue in her trust capacity without actual accommodations being foisted upon her.

126.    Yet, Ms. Doe proceeded in good faith, stating to Defendant Parsons that she would do whatever needed to be done, and disclose her whole personal history to whomever needed to hear it, ***because she needed this medical leave***.

*       *       *

127.    The foregoing is hereinafter referenced as the "August 14, 2020 Episode."

128.    Similarly situated individuals of ordinary resolve would not have pursued their federal rights after experiencing the August 14, 2020 Episode, as Ms. Doe did.

129.    Indeed, based on Defendant Parsons' own admission, her actual and very specific intent was to discourage other employees from also requesting leave.

*       *       *

130.    Following the August 14, 2020 Episode, Ms. Doe contacted the President of the Berlin Education Association ("BEA President"), to report the incident and seek advice.

131.    Ms. Doe tried to speak with Principal Kitzman, but was unable meet with him at that time and left building.

132.    Ms. Doe sought out and received medical treatment.

133.    Ms. Doe sought out and engaged legal counsel.

134.    Otherwise, Ms. Doe spent the next several days uncontrollably sobbing and unable to care for herself or her family.

135. For Defendant Parsons' part, she followed the August 14, 2020 Episode:

    a. unsuccessfully trying to reach Defendant Board's Attorney; and

    b. drafting, revising and sending an email to Defendant Benigni and non-party Nicole Damiata to fabricate a record of the incident ("August 14, 2020 File Memo").

136. Even in her own sanitized and self-serving report to her boss describing the August 14, 2020 Episode, Defendant Parsons makes several key statements against interest.

137. Defendant Parsons boasts to her boss that she is being hypervigilant about FMLA fraud and/or abuse, and reports that she told Ms. Doe that her personal disbelief of the Medical Certification was part of her hypervigilance.

138. Defendant Parsons even acknowledges *yelling at Ms. Doe* about her other teachers (350) who might want to request FMLA leave:

> I interrupted [Ms. Doe] abruptly, raised my voice slightly and told her that she had to realize that we are dealing with 350 teachers who are nervous about returning to school. I told her I needed to be extremely cautious as we move forward with FMLA leaves to make sure… the requests comply with the law

139. As such, Defendant Parsons confesses that she considered Ms. Doe's Request for Leave as just one request among a potential 350 "FMLA leaves," while also belittling Ms. Doe's properly-certified medical condition as "being nervous about returning to school."

140. Notably, Defendant Parsons also told Defendant Benigni that she knew Ms. Doe did not, in fact, request leave for childcare when Ms. Doe called *only* to inquire about leave policy.

141. Defendant Parsons concludes her report to her own boss, fittingly, with a complaint about Ms. Doe and her alleged interference with her own staffing objectives.

142. Defendant Parsons complained that—when Ms. Doe tried to meet with Principal Kitzman to complain about her (Defendant Parsons)—she was *interfering* with Principal Kitzman's ability to interview Ms. Doe's replacement (in the event her leave was granted).

143.    In actual fact, Ms. Doe had tried to speak with Principal Kitzman, after being dressed down and humiliated by Defendant Parsons, *but was not able to do so at any length.*

144.    Principal Kitzman's telephone call to Defendant Parsons thereafter was motivated by his concern for Ms. Doe's health and safety and to inquire what Defendant Parsons and/or Ms. Damiata had done to Ms. Doe put her the evident state of shock, horror, and trauma that he had just personally witnessed.

145.    Principal Kitzman did not call Defendant Parsons, as she suggests, to complain about Ms. Doe interrupting his efforts to assist Defendant Parsons in her staffing objectives.

*    *    *

146.    Defendant Parsons false written statement to the Superintendent of Schools, which statement she knew to be untrue, could serve no other purpose than to mislead the Superintendent in his official duties which, as of that moment, would include giving Defendant Parsons, herself, the executive discretion to require Ms. Doe to undergo a Second Opinion Exam.

### REQUIREMENT OF SECOND OPINION MENTAL HEALTH EXAM

147.    On Monday, Defendant Benigni returned from vacation.

148.    Defendant Parsons spoke with Defendant Benigni about the following:

    a.  the August 14, 2020 Episode;

    b.  her belief that Ms. Doe should be subject to a Second Opinion Exam;

    c.  at least one other Non-Resident Teacher/Caregiving making a similar and/or substantially identical request for leave as Ms. Doe;

    d.  Defendant Parsons' fear about additional requests for leave will be made by District Staff, or any identifiable subset of the District Staff (*e.g.*, Non-Resident Teacher/Caregivers).

149.    On Tuesday, Defendant Benigni also spoke with the BEA President, who routinely liaises between District Staff, on one hand, and District administrators and policymakers, on the other, about all manner of workplace issues and complaints.

150.    That day, the BEA President spoke with Defendant Benigni about a variety of matters, including the concerns of the Non-Resident Teacher/Caregivers.

151.    In particular, the BEA President protested the treatment of Ms. Doe during the August 14, 2020 Episode, and was threatening legal action by her association if the matter was not rectified.

152.    In evident acknowledgment of the impropriety of Defendant Parsons' conduct, Defendant Benigni interrupted the BEA President's "rant" (as she, herself, described it) and stated that Defendants would grant Ms. Doe's Request for Leave, *but only if she submitted to a psychological examination by the District's doctor*.

153.    Defendant Benigni knew—as he was speaking with the BEA President—that Ms. Doe did <u>not</u> request childcare leave.

*        *        *

154.    Defendants invoked U.S. Department of Labor ("DOL") regulation for an employer-mandated second opinion exam: "[an employer] who has reason to doubt the validity of a medical certification may require the employee to obtain a second opinion at the employer's expense." (29 CFR § 825.307(b)) ("Second Opinion Provision").

155.    The Second Opinion Provision is a known mechanism by which employers manage employees' use of FMLA leave time, to which employees may otherwise be entitled as a matter of federal statutory right.[4]

---

[4] Matrix Absence Management, a Member of the Tokio Marine Group, publishes a blog called *Adventures in Absence Management*, wherein it advocated as follows:

> Strategic use of the 2nd opinion process is a good investment for employers. The advantages we have seen include the "grapevine effect" in the workplace, organically increasing employee awareness that you are managing leave usage. This increased awareness can often result in reduced frequency and duration of employee leaves.

https://matrix-radar.com/blogs/2019/07/fmla-2nd-and-3rd-opinion-process-a-powerful-tool-to-manage-intermittent-fmla (last visited: March 12, 2021)

156.     This "strategic use" of the Second Opinion Provision is *per se* unconstitutional in a public employment context and/or is constitutionally suspect when exercised in such close proximity to employees' constitutional rights (privacy, speech, assembly, equal protection).

157.     The DOL's Second Opinion Provision also directs that the subject employee shall be "provisionally entitled to the benefits of the [FMLA]," which permits offending employers— such as Defendant Board—to seek putative "safe harbor" for their decision to invoke the Second Opinion Provision. ("Second Provision Safe Harbor").

158.     That is, if the forced Second Opinion Exam does <u>not</u> confirm an employee's need for leave as requested, the Board may deny the leave based upon the facially legitimate results of the Second Opinion Exam ("Second Opinion Results").

159.     However, if the Second Opinion Results confirm the conclusions on the medical certification, then that employee's provisional FMLA leave is transformed into actual FMLA leave.  At that point, with no technical denial of the employee's right to leave under the FMLA, the employer may claim that there was no (cognizable) violation of the FMLA because there was no injury.

160.     Defendant Parsons was well-aware of the Second Provision Safe Harbor.

161.     Defendant Parsons was also conscious that her own wrongdoing—during the August 14, 2020 Episode and otherwise—jeopardized Defendant Board's legitimate use of the Second Opinion Provision and the Second Opinion Safe Harbor.

162.     Defendant Parsons knew that going forward with the Second Opinion Exam would violate Ms. Doe's federal right to medical leave, and did so anyway, because she thought she could use the Second Provision Safe Harbor to escape detection. [5]

---

[5] Given the clear record of malice, limited discovery would be warranted to support a substantive due process privacy claim based upon Ms. Doe's forced submission to psychological examination, through a state actor's fraud,

163.     As early as August 18, 2020, Defendant Parsons exhibited consciousness of her wrongdoing by taking steps to cover, conceal, and/or manage its impact, as needed to avoid detection.

*       *       *

164.     On August 18, 2020, Defendant Board officially made its decision to invoke the Second Opinion Provision, and granted Ms. Doe provisional leave, subject to the results of the Second Opinion Exam.   ("Second Opinion Decision").

165.     Thereafter, to effectuate the Second Opinion Decision, Defendant Parsons only needed to (i) reserve an examination time with the Board's Doctor and (ii) prepare the notification to Ms. Doe.

166.     However, <u>before</u> Defendant Parsons took any further steps to effectuate that decision, she contacted Ms. Doe in an eleventh-hour effort to dissuade/discourage Ms. Doe from pursuing FMLA leave.  ("August 18, 2020 Request Not to Pursue Medical Leave").

167.     Defendant knew that, once the Board went forward with the Second Opinion Exam—which was now just a ministerial act within her sole discretion—her fraud and deception could be revealed.

168.     Defendant Parsons believed that, if Ms. Doe could be persuaded to "voluntarily" withdraw her request and accept some alternative to her medical leave rights, the fact of Defendant Parsons' own wrongdoing in procuring the Second Opinion Decision could stay hidden.

---

for a patently unconstitutional use of otherwise neutral federal laws, employing a patently false neutral pretext for cover, and then claiming benefit of—even relying from the outset on—a construction of the FMLA with which they can then claim no harm, no foul.

169. Ms. Doe declined Defendant Parsons' overtures and asked (again) for the Board to issue a decision. She advised Defendant Parsons of her worsening health condition and the tremendous toll the Request to Leave process was taking on her and her family.

170. Thereafter, Defendants engaged Dr. John Bonetti, a forensic psychologist and the associate director of the Forensic Consultation Service at the Institute of Living in Hartford ("Board's Doctor") to conduct a Second Opinion Exam.

\* \* \*

171. On Wednesday August 19, 2020 at 4:43 PM, Ms. Doe received an emailed correspondence from Defendant Board, signed by Defendant Parsons, granting Ms. Doe "provisional" leave, pending a medical examination:

> On August 13, 2020, we received your most recent information from your healthcare provider to support your need for FMLA leave due to your own serious health condition. We have reviewed the information related to your need for leave under the FMLA along with your supporting documentation and have decided that additional information is needed to determine if your leave request qualifies as FMLA leave. As we make this determination, you are entitled to be on FMLA leave on a provisional basis, pending an independent medical examination.

172. The letter did not identify "the information related to [Ms. Doe's] need for leave under the FMLA" on which the Board based its decision.

173. Nor did the letter identify what "additional information" the Board would need to determine if Ms. Doe's leave request qualifies as FMLA leave.

174. The letter did not identify any "reason" for the Board to "doubt the validity of [Ms. Doe's] medical certification."

**SECOND OPINION EXAM**

175. The Second Opinion Exam, under the circumstances described herein, cost Ms. Doe much more than the time and expense of submitting to the exam.

176. Ms. Doe was compelled by Defendant to share details of her personal history that she has never shared with any other human being, *except on an entirely voluntary basis*. She believed her federally-secured right to medical leave—and the corresponding right to self-manage her health condition, otherwise, in private—depended on such disclosure.

177. The prospect of submitting to the Second Opinion Exam consumed Ms. Doe with dread for seven days and sleepless nights.

178. The hours spent preparing materials, at the request of the Board Doctor were, in themselves, excruciating exercises in trauma management.

179. Ms. Doe attempted get an earlier examination date from the Board's Doctor, but was unable.

180. Otherwise, she continued to seek out trauma therapists on her own, in addition to her then current-therapist, and was resolved to do whatever was necessary to return to good health and return to the classroom as quickly as possible.

*       *       *

181. On August 28, 2020, Ms. Doe drove to the Institute of Living and met with the Board's Doctor.

182. Ms. Doe sat on a couch and the Board's Doctor sat behind his desk.

183. After a brief exchange of pleasantries, questions about safety-mask protocols, etc., Board's Doctor started (looking at, and then up from, a document on his desk):

> So, the reason for your visit today is, I received a request from the Berlin Board of Education to conduct an independent evaluation [for FMLA purposes]. The reason behind the request it indicated, you had made a previous request for childcare leave and that was denied.

184. Ms. Doe sat in silence for ten seconds, stunned.

185. The false Childcare Pretext would not go away.

186.     Ms. Doe could not comprehend why Defendant Parsons would go to these lengths to hurt her.

187.     Ms. Doe did not know what she had done to warrant Defendant Parsons' ire and animus.

188.     Ms. Doe could only verbalize adamant denials and cries of disbelief.  She became highly agitated, blood rushing to her face, mildly hyper-ventilated and sobbing throughout the balance of the ninety-minute session.

189.     During that time, the Board's Doctor took Ms. Doe through all of Ms. Doe's childhood trauma—extending back to the age of twelve—in order to determine if Ms. Doe was "faking it," as Defendant Parsons believed she was.

190.     In this important respect, the second opinion mental health exam is fundamentally different in nature than, say, a second opinion physical health exam to determine a line worker's range of motion.

191.     After the Second Opinion Exam, Ms. Doe sat in her car in the parking lot of the Institute of Living and broke down emotionally.  She was utterly traumatized and scared.

192.     And, for one and a half hours of being probed and made to revisit specific details of childhood traumas, *under the color of law and under completely false pretenses*, the Defendants reimbursed Ms. Doe $59.33, plus mileage.

### THE FAIR INFERENCE FROM THE USE OF A FALSE PRETEXT

193.     The use of the false Childcare Pretext in order to invoke the Second Opinion Provision allows for, and demands, a number of more than plausible conclusions and inferences.

194.     Chiefly, under these circumstances, the false pretext for the discretionary act of requiring a Second Opinion Exam permits the inference that Defendants were dissembling to cover

up a discriminatory purpose. *See Reeves v. Sanderson Plumbing Products*, Inc., 530 U.S. 133, 147 (2000).

<u>**THURSDAY SEPTEMBER 10, 2020**</u>

195. As of September 10, 2020, Ms. Doe did not yet know the results of the Second Opinion Exam.

196. That day, Ms. Doe served Defendant Board with a Notice of Claim and Notice to Preserve Evidence.

197. A Connecticut State Marshal delivered Ms. Doe's Notice of Claim—not concealed, wrapped, or covered—into the hands of Defendant Parsons, who accepted service on behalf of Defendant Board.

198. Defendant Parsons read the Notice of Claim at that time.

199. The Notice of Claim set forth the circumstances of the outrageous treatment of Ms. Doe related to her Request for Leave.

200. The Notice of Claim explicitly identified Defendant Parsons as Ms. Doe's primary abuser.

201. The Notice of Claim also identified the false Childcare Pretext as potentially very significant source of liability for Defendant Board:

> Nevertheless, under threat of adverse employment action, ▇▇▇▇▇▇ submitted to the additional examination. The session further illuminated the Board's violation of law, bad faith conduct, and use of a fabricated, ostensibly neutral pre-text to violate ▇▇▇▇▇▇'s rights. That is, at the top of the session, Dr. Bonetti stated the putative reason the Board was requiring a second opinion: because ▇▇▇▇▇▇ made her Request for Leave only after her initial request for leave *based upon childcare* needs was denied. That is just not true. Worse, fabricating a "reason to doubt [its] validity" after the fact suggests an attempt to cover-up the mishandling of the Request for Leave in the first instance. This conduct is outrageous.

Notice of Claim (excerpt), served in-hand on September 10, 2020.

202.    Defendant Parsons knew that she was the source and proponent of the false Childcare Pretext.

*     *     *

203.    That same day, Defendant Parsons received a written report from the Board's Doctor, dated September 9, 2020 ("Second Opinion Report").

204.    The Second Opinion Report completely vindicated Ms. Doe and offered additional facts that bear upon the claims in issue.

205.    In sum, the Second Opinion Report confirmed several salient facts:

    a.    that, contrary to Defendant Parsons' stated belief, Ms. Doe did actually suffer from the condition identified on her Medical Certification;

    b.    that Ms. Doe was not feigning symptoms for secondary gain; and

    c.    that Ms. Doe was not exaggerating her symptoms.

206.    The Board would now be required to approve the Request for Leave, since the Second Opinion Report did not materially differ from Ms. Doe's Medical Certification.

207.    Had there been a material difference, Defendants may have required Ms. Doe to obtain a *third* opinion, at her expense.

208.    The Second Opinion Report differed from Ms. Doe's Medical Certification <u>only</u> in the two following respects.

209.    <u>First</u>, and most notably, in addition to confirming that FMLA leave was appropriate under the circumstances, the Board's Doctor suggested that Ms. Doe's own medical provider had *<u>under-estimated</u>* the severity of Ms. Doe's condition.  This was extraordinary.

210.    <u>Second</u>, and more disturbingly, the Second Opinion Report differed from the Medical Certification in its breadth and detail.

## THE DISTURBING LEVEL OF DETAIL IN THE SECOND OPINION REPORT

211.    The Second Opinion Report included numerous private and personal facts about Ms. Doe that the law intended to remain private and confidential, under the circumstances.

212.    Those private and personal facts are delivered directly into the hands of Ms. Doe's primary abuser, Defendant Parsons.

213.    The FMLA, however, is supposed to limit the scope of a second opinion exam to the information certified by the employee's health care provider.

214.    Elsewhere, the FMLA provides for the correspondingly *limited* scope of information that a certification needs to contain:

- the date on which the serious health condition commenced;
- the probable duration of the condition;
- the appropriate medical facts within the knowledge of the health care provider regarding the condition; and
- a statement that the employee is unable to perform the functions of the position of the employee;

215.    In turn, DOL Regulations make plain the extremely proscribed nature of an employer's right to information beyond the foregoing, directing that "[e]mployers may not ask health care providers for additional information beyond that required by the certification form."

216.    Upon receiving the complete Medical Certification, DOL Regulations provided very specific steps Defendant Board could have taken to clarify and/or to authenticate the document and the information contained thereon ("Clarification/Authentication"), and what other information the Board *could* have considered in determining Ms. Doe's entitlement to FMLA-protected leave.  Seeking access to other information, at that stage, was prohibited.

217.    If Defendant Board sought and/or needed Clarification/Authentication, federal regulations would have permitted the Board to do any of the following:

a. Provide Ms. Doe's health care provider with a copy of the Medical Certification and request verification that the information contained on the certification form was completed and/or authorized by the health care provider who signed the document; no additional medical information may be requested, or

b. Contact the health care provider to understand the handwriting on the Medical Certification or to understand the meaning of a response; but *no questions may be asked for additional information beyond that required by the certification form*.

218. Defendant Board chose not to follow any of the permissible methods of addressing any good faith questions it may have had about the Medical Certification.

219. For example, Defendant Parsons, through the appropriate personnel, could have contacted Ms. Doe's medical provider and sought clarification about the frequency of the "frequent panic attacks" that she identified on the Medical Certificate.

220. Defendant Parsons did not seek such clarification.

221. Defendant Parsons, again through appropriate personnel, could have contacted Ms. Doe's medical provider and sought clarification about the meaning of the word "debilitating," as used to describe symptoms of the condition.

222. Defendant Parsons did not seek such clarification.

223. Rather, Defendant Parsons fraudulent obtained authority to invoke the Second Opinion Provision, to give herself—as Ms. Doe's employer and primary abuser—more access to Ms. Doe's intimate and private information than she would have had *absent her fraud in fabricating—and promoting—the false Childcare Pretext*.

\* \* \*

224. The level of historical detail about Ms. Doe's personal trauma and mental condition—including the specific prescription medication she has taken and is taking, and their

dosages—disclosed information well beyond what the FMLA intended employers to possess about their employees under these circumstances.

225.   Most notably, the medical certification does <u>not</u> require information about the employee's medical history or his or her specific regime of prescription medication, even if that information may be related to the condition for which the employee is seeking leave.

226.   *A priori*, an employer <u>cannot</u> access an employee's medical history and drug prescriptions through Clarification/Verification.

227.   Here, by asserting a known false pretext to invoke the Second Opinion Provision, Defendant Parsons effectively and fraudulently circumvented those proscriptions and gained access to those matters and other severely private and sensitive information, *e.g.*, that Ms. Doe:

      a.  had a "difficult developmental history"

      b.  beginning in her teens, she had to seek treatment from a psychiatrist

      c.  she received therapy and medication management through her teens and 20's

      d.  after a hospitalization 20 years ago (2001), she was diagnosed with panic disorder.

      e.  As part of her treatment, over those 20 years, she tried the following medications: zoloft, effexor, paxil, xanax and pamelor.

      f.  Her current medication and dosage is 15 mg of Lexapro daily, which was increased from 10 mg in July 2020.

      g.  She takes Vistaril for episodic management of panic attack symptoms.

228.   While the foregoing information was obviously useful, and possibly essential, to the Board's Doctor in assessing Ms. Doe's present condition, ***there is no reason that this information should be in the hands of Defendants***.  None.

229.   Indeed, there are innumerable reasons why that information should <u>not</u> be in the hands of Defendants, not the least of which is Defendants' evident malice, ill-will, and recklessness exhibited towards Ms. Doe.

230.    More fundamentally, even in the absence of the demonstrably bad state actor, Ms. Doe's privacy certainly should not be invaded by the government—or by any private employer with the government's imprimatur—without some kind of compelling state interest.

## FOIA REQUEST AND WITHHOLDING/DESTRUCTION OF DOCUMENTS

231.    Defendant Parsons' cover-up began with her August 14, 2020 File Memo, continued with the August 18, 2020 Request to Withdrawal Leave Request, the Second Opinion Exam, itself, and concluded with the sanitizing of Defendants' records, which only came to light on March 2, 2021 when Defendants finally provided (some) documents responding to Ms. Doe's FOIA request, dated December 7, 2020 ("FOIA Request").

232.    Defendant Board prompted Ms. Doe's FOIA Request by explaining that its Second Opinion Decision was based upon (i) Ms. Doe's supporting documentation (i.e., her Medical Certification) and (ii) "other information related to [her] need for leave under the FMLA."

233.    Ms. Doe's FOIA Request sought access to (not copies of) the complete record of her Request for Leave, which record should have provided some clues about such "other information."

234.    However, Defendant Board stonewalled Ms. Doe's due diligence efforts by producing (nearly three months after the FOIA Request) only the following: (i) a very incomplete copy of Ms. Doe's "personnel records"; (ii) a copy of the District Leave Policy; and (iii) a copy of the Board's insurance policy.  ("FOIA Response").

235.    The FOIA response was prepared by—or under the immediate direction and review of—Defendant Parsons, who personally signed and vouched for the FOIA Response.

## DOCUMENTS CONCERNING MS. DOE'S REQUEST FOR LEAVE

236. By way of example, Ms. Doe's FOIA Request sought access to (not copies of) the following category of documents:

> Communications regarding [Jane Doe's] August 2020 request for temporary leave of employment ("Request for Leave"), including internal notes, texts messages, and correspondence, as well as non-privileged communications with third-parties concerning that request. This request also seeks voice and texts messages, which should have been preserved following the Board's receipt of a Notice of Claim on September 10, 2020 (see below).
>
> For purpose of your internal record collection efforts, known custodians of relevant records include the following individuals and/or their agents:
>
> • Ms. Diane [sic] Parsons
> • Mr. Brian Benigni; and
> • Dr. John Bonetti (the Board's medical professional)

237. Defendant Board's FOIA Response enclosed copies of a few responsive documents, but only those that were produced by virtue of being in, what Defendant Parsons called, Ms. Doe's "Personnel Records."

238. Defendants' FOIA Response failed to provide—or to explain the absence of—*all* communications regarding Ms. Doe's Request for Leave.

239. Such responsive documents would have necessarily included the letter from Ms. Dori Antonetti, Esq. to the Board's Doctor, dated August 21, 2020 ("Attorney-Expert Letter").

240. Ms. Doe only knows about the existence of the Attorney-Expert Letter because the Board's Doctor (i) expressly relied upon it his Second Opinion Report and (ii) was reading from an unidentified document at the Second Opinion Exam.

241. Upon information and belief, the Attorney-Expert Letter was withheld or destroyed by Defendant Parsons or at her direction.

242. Upon information and belief, the Attorney-Expert Letter would provide a documentary link between the two most public showings of Defendants' discriminatory scheme:

    a. The August 14, 2020 Episode, wherein Defendant Parsons uttered to Ms. Doe the false Childcare Pretext, but quickly disavowed it,

and

    b. The August 28, 2020 Second Opinion Exam, wherein the Board's Doctor, *apparently reading from a document*, repeated to Ms. Doe the Childcare Pretext, and later disclosed in his report that he had reviewed the Attorney-Expert Letter.

243. Defendant Parsons had good reason to feel threatened by the disclosure (and existence) of the Attorney-Expert Letter—or any other such document—that would help connect the dots between her and the statement of the Board's Doctor, on August 28, 2020.

244. If Defendant Parsons is identified in some of the requested communications as the source and/or propagator of the Childcare Pretext, then it would provide documentary evidence that she should be personally liable for the legal damages resulting therefrom.

### DOCUMENTS CONCERNING DISTRICT STAFF'S REQUESTS FOR LEAVE

245. By way of further example, Ms. Doe's FOIA Request sought access to (not copies of) the following category of documents concerning the Board's "handling of [other] employee requests for leave of employment, from July 2020 to the present."

246. Defendants' FOIA Response did not permit access to, or explain the absence of, any documents concerning informal protocols, conventions, customs or procedures regarding the handling of employee requests for leave of employment, from July 2020 to present, except those documents as they may relate to Ms. Doe.

247. Among the responsive documents should have been internal emails seeking or giving direction regarding the handling such requests, e.g., as there were in Ms. Doe's personnel records.

248. Defendant Parsons herself indicated that she was "making a list" of District Staff who had inquired about leave, but no such lists were produced.

\* \* \*

249. <u>Failure to Preserve Documents</u>. Defendants had been on notice since September 10, 2020 of their legal obligation to preserve communications related to Defendants' handling of Ms. Doe's Request for Leave.

250. Defendant Parsons' intentional withholding/destruction of relevant documents supports, among other negative inferences, (i) that the content of those documents demonstrate that Defendant Parsons was the source and/or propagator of the Childcare Pretext, and other acts of malice, and (ii) that the content of those documents demonstrates the disparate treatment of Ms. Doe compared to similarly situated individuals. *See, infra.*, Fifth Cause of Action ("Intentional Spoliation of Evidence"), seeking monetary damages under Connecticut common law.

### ILLEGAL FITNESS-FOR-DUTY CERTIFICATION

251. As a final indignity, in violation of 29 CFR § 825.312, Defendants required Ms. Doe to submit to a fitness-for-duty examination *at her own expense*, despite Defendant Board's failure either:

    a. to have a uniformly-applied policy or practice that requires all similarly-situated employees to obtain a fitness-for-duty certification prior to returning from FMLA leave, or

    b. to have advised Ms. Doe previously that such a certification would be required to return to work.

252. If Ms. Doe did not comply and submit to another psychological examination, Defendants effectively threatened her once again with loss of her FMLA rights.

\*　　\*　　\*

253.　All of the foregoing facts suggest that, at a minimum, something was deeply wrong with Defendants' handling of Ms. Doe's Request for Leave, not as an individual employee in a medical crisis, but as a threat to her grander staffing objectives.

254.　As the Director of Human Resources for the entire District, Defendant Parsons believed she had a lot of very important "other information" to consider for Ms. Doe's Request for Leave:

  a.　Defendant Parsons' "list[s]" of District Staff inquiring about leaves of absence;

  b.　an inventory/assessment of all District Staff FMLA-eligibility, broken down by school and grade;

  c.　an inventory/assessment of all District Staff leave histories and/or accrued leave;

  d.　an inventory/assessment of the District's capability to accommodate District Staff with then-extant disabilities who may require accommodation;

  e.　risk management assessments, from insurers and legal counsel, alike;

  f.　COVID-19 Updates from governmental agencies;

  g.　media reports about teacher shortages in other school districts; and

  h.　leave of absence requests from other District Staff, and records regarding same;

255.　Defendants reviewed and considered some or all of the foregoing categories of information as part of its review of Ms. Doe's Request for Leave.

256.　Indeed, Ms. Doe requested access to some or all of the foregoing categories of information, and was denied.

257.　*However, none of the innumerable other factors that might have affected Defendant Parsons' personal staffing objectives bear <u>any</u> legal relevance to either: (i) Ms. Doe's statutory right to medical leave <u>without</u> submitting to a second opinion exam, <u>**or**</u> (ii) Ms. Doe's constitutional right to equal protection of the laws.*

## SUMMARY OF CAUSES OF ACTION

258.     As set forth more specifically below, the foregoing supports several causes of action

against the Defendant Parsons, Defendant Benigni, and Defendant Board:

- Retaliation for Ms. Doe's exercise of her FMLA rights;

- Violation of Ms. Doe's right to equal protection of the law by the individual Defendants;

- Violation of Ms. Doe's right to equal protection of the law by Defendant Board;

- Intentional infliction of emotional distress under Connecticut common law; and

- Intentional spoliation of evidence under Connecticut common law.


[remainder of page intentionally blank]

## FIRST CAUSE OF ACTION
### 29 U.S.C. § 2612, *et seq.* – Retaliation for Exercise FMLA Rights
### (Conn. Gen. Stat. § 31-51kk, *et seq.*)
### (Against All Defendants)

259.     Plaintiff repeats and re-alleges the above paragraphs as if the same were fully set forth herein.

260.     Ms. Doe was an eligible employee under the FMLA, having worked at least 1,250 hours in a 12-month period.

261.     Defendant Board is an employer as defined by the FMLA, being a public agency within the meaning of the state.

262.     Ms. Doe was entitled to take twelve (12) weeks of leave, of sixty (60) days of intermittent leave, under the FMLA, having not used any FMLA leave for the previous school year.

263.     Defendants violated the Ms. Doe's rights under the FMLA in one or more of the following ways, which in sum amount to purposeful retaliation against Ms. Doe for inquiring about, trying to exercise, and/or exercising those rights:

    a.   failing to notify Ms. Doe that she was an eligible employee under the FMLA upon her request for qualifying leave;

    b.   failing to advise Ms. Doe of the anticipated consequences of her failure to provide adequate certification;

    c.   actively discouraging Ms. Doe from exercising her rights under the FMLA, and retaliating against her once she did invoke those rights;

    d.   failing to advise her within five (5) business days of their decision on her request for medical leave;

    e.   subjecting Ms. Doe to an invasive and involuntary second-opinion mental health examination as a condition to the free exercise of her rights under the FMLA,

        i.   without any legitimate basis to doubt the validity of Ms. Doe's medical certification,

       ii.   in pursuit of a professed and illegitimate purpose, and/or

iii. based upon the false Childcare Pretext, *i.e.*, that Ms. Doe had allegedly applied for childcare leave and was denied;

f. denying Ms. Doe her right to self-manage her personal medical condition in privacy, and without undue government or employer intrusion, as contemplated by the statutory structure of the FMLA;

g. requiring Ms. Doe to submit to a fitness-for-duty psychiatric exam;

h. failing to maintain "records and documents related" to the Request for Leave; and

i. for the records and documents related to the Request for Leave that the Board did maintain, failing to maintain them as confidential medical records.

\*     \*     \*

264. Defendants subjected Ms. Doe to the one or all of the foregoing actions which were likely to dissuade a reasonable worker in Ms. Doe's position from exercising his or her legal rights.

265. Indeed, Defendant Parsons expressly announced to Ms. Doe that the actual intent of not granting leave was to dissuade other District Staff from exercising their rights:

I have over three hundred teachers. And I cannot have them thinking they could go get letters like this to not have to come to work. I am not going to grant your leave.

266. After the August 14, 2020 Episode, Defendant Parsons amplified the retaliatory efforts against Ms. Doe by promoting the false Childcare Pretext in order to ensure that Ms. Doe would be made to suffer through a Second Opinion Exam of her hidden mental health condition.

267. Ms. Doe was made to, and did, so suffer.

268. As a result of the Defendants' retaliation against Ms. Doe for exercising her rights under the FMLA, Plaintiff has suffered damages and now seeks economic damages, attorney's fees and injunctive relief.

## SECOND CAUSE OF ACTION
### (42. U.S.C. § 1983 – Equal Protection Clause)
### (Connecticut Constitution, Art. I, Sec. 20)

269.     Plaintiff repeats and re-alleges the above paragraphs as if the same were fully set forth herein.

270.     This is an equal protection claim based upon *LeClair/Hu* malice-based equal protection violation.  *See Hu v. City of New York*, 927 F.3d 81 (2019).  Malice, ill-will, and/or reckless disregard for Ms. Doe's rights being more than plausibly alleged above.

271.     Defendants violated Ms. Doe's right to equal protection of the law, under the federal and state constitutions, as follows:

   a.  Ms. Doe, compared with others similarly situated was selectively treated; and

   b.  Such treatment was based on impermissible considerations such as malice, bad faith intent to injure a person.

272.     As set forth above, Defendant Parsons and/or Defendant Benigni acted with evident subjective ill will and malice toward, and/or with reckless disregard for the rights of, Ms. Doe.

273.     Through Defendant Parsons' verbal abuse and discouragement of Ms. Doe during the August 14, 2020 Episode, Defendants treated Ms. Doe differently than other members of several different classes of employees also subject to Defendant Parsons' authority.

### *LeClair/Hu* Comparator Classes

274.     At all relevant times herein, there was, at least a reasonably close resemblance, if not a high degree of similarity, between Ms. Doe and the following individuals and/or classes of individuals (each referred to as a "Comparator Class").

275.     <u>First</u>, District Staff.  This Comparator Class was defined herein as certified classroom teachers across the District.

276. Defendant Parsons, herself, defined this Comparator Class during the August 14, 2021 Episode when she said: "I have <u>over three hundred teachers</u> and I cannot have <u>them</u> thinking they can show up with a letter like this not come to work."

277. Defendant Parsons, further defined this in the August 14, 2020 File Memo wherein she wrote to her boss: "[Ms. Doe] has to realize that we are dealing with 350 teachers who are nervous about returning to school."

278. <u>Second</u>, Non-Resident Teacher/Caregivers at Griswold Elementary and/or across the entire District. This Comparator Class was defined by Ms. Doe when she first approached Defendant Parsons, on her and their behalf, to inquire about District Leave Policy in the event the District re-opened with in-person instruction but their home school district reopened with "remote instruction."

279. <u>Third</u>, Teacher/Caregivers at Griswold Elementary and/or across the entire District, without reference to residency issues. This Comparator Class was defined by Defendant Parsons when she advised Jane Doe No. 2 that she was aware of several members of her District Staff who had young children with similar issues, and that she was "making a list" of such individuals.

280. <u>Fourth</u>, District Staff who requested FMLA leave based upon a non-obvious medical condition, such as Ms. Doe's condition. This Comparator Class was defined by Defendant Parsons when she expressed her fear that members of her District Staff would make requests similar to Ms. Doe ("I cannot have them think they can go get a letter like this…."), by which she meant medical certifications describing a non-obvious medical condition that she, as a lay person, could not readily perceive.

281. Defendant further defined this Comparator Class when she wrote to Principal Kitzman on August 13, 2020 to advise him that Jane Doe No. 3 had "requested the FMLA paper

work from Nicole [Damiata] for a personal medical condition (same request as [Plaintiff Jane Doe])."

282.    <u>Fifth</u>, Griswold Staff who were classroom teachers for the same grade-level as Ms. Doe.  This Comparator Class was defined by Defendant Board when it published two separate job listings for an LTS (substitute teacher) position as a classroom teacher at Griswold Elementary in the same grade-level, one of which was for Ms. Doe's classroom.[6]

### DISPARATE TREATMENT

283.    The President of the BEA confirmed that no other members of the District Staff (necessarily inclusive of all of the other Comparator Classes) were treated like Ms. Doe in the first instance—being dressed down, questioned, and abused by Defendant Parsons—or thereafter being required to submit to Second Opinion Exam.

284.    Both Jane Doe No. 2 and Jane Doe No. 3 inquired about their respective leave rights relative to childcare issues occasion by the coronavirus health emergency.  Jane Doe No. 3 made a request for FMLA leave for the same medical condition as Plaintiff Jane Doe, according to Defendant Parsons.

285.    Defendants did not subject either of the other Jane Does to the same treatment as Plaintiff Jane Doe, to wit: (i) verbal abuse, (ii) fabrication of a neutral pre-text to justify a second opinion exam, (iii) the request that she withdraw her request; and (iv) the Second Opinion Exam, itself.

286.    By virtue of the foregoing, Defendants used a facially neutral law—the FMLA Second Opinion Provision—to discriminate against Ms. Doe as one of a class of individuals Defendant Parsons wanted to discourage from making any similar requests.

---

[6] The Sealed Doe Declaration indicates the grade-level.

287.     Alternatively, to the extent Ms. Doe has not sufficiently alleged Comparator

Classes and/or Differential Treatment (which is not conceded), the absence of known-Comparator

Classes and their treatment relative to Ms. Doe, would be owed to:

    a.   Defendant Parsons' own intentional misconduct in failing to fully
      respond to Ms. Doe's FOIA Request;

    b.   Defendant Parsons' successful campaign to make an example of Ms.
      Doe to discourage other similarly situated individuals from pursuing
      their own rights.

288.     As to the latter issue, in selecting Ms. Doe for <u>any</u> kind of treatment for the express

purpose of discouraging other members of her class from requesting leave (FMLA or otherwise),

Defendants necessarily treated Ms. Doe differently from the rest of the class.

289.     That is, the natural result of mistreating one member of a class in a particular

fashion in order to discourage other members of that class from acting like their mistreated class-

member, if successful, will yield no direct comparators.

*     *     *

290.     Ms. Doe suffered and continues to suffer severe emotional trauma and distress as a

result of Defendants' animus-based selective enforcement of the law against her, different from

the manner in which they enforced the law against other similarly situated individuals.

**THIRD CAUSE OF ACTION**
(42. U.S.C. § 1983 – Equal Protection Clause)
(Connecticut Constitution, Art. I, Sec. 20)
*Monell* Liability for Defendant Board

291.     Plaintiff repeats and re-alleges the above paragraphs as if the same were fully set

forth herein.

292.     The injuries alleged above were the result Defendant Board's policies, practices,

and procedures.

293.     Through its deliberate conduct, Defendant Board was the moving force behind Ms. Doe's injuries.

294.     Both Defendant Parsons, as the Director of Human Resources, and Defendant Benigni are policymakers (*de jure* or *de facto*) for Defendant Board in matters of employee leaves of absence.

295.     As such, Defendant Board is liable for the tortious conduct of Defendant Parsons and Defendant Benigni.

## FOURTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress

296.     Plaintiff repeats and re-alleges the above paragraphs as if the same were fully set forth herein.

297.     Defendants' conduct and treatment of Ms. Doe was extreme and outrageous.

298.     Defendants intended to inflict emotional distress and/or knew or should have known that emotional distress was the likely result of their conduct

299.     Defendants' conduct caused Ms. Doe to suffer emotional distress.

300.     As result of the foregoing, Ms. Doe's emotional distress was severe, and continues.

## FIFTH CAUSE OF ACTION
Intentional Spoliation of Evidence

301.     Plaintiff repeats and re-alleges the above paragraphs as if the same were fully set forth herein.

302.     As of September 10, 2020, Defendant Board and Defendant Parsons had knowledge of Ms. Doe's impending civil action involving the plaintiff.

303.     The Notice of Claim was delivered directly into Defendant Parsons' hands on September 10, 2010 by a Connecticut State Marshal.  Defendant Parsons read the Notice.

304. Defendant Parsons undertook to sanitize the Board's records of communications, notes and memoranda that would document the Board's deliberative process relative to the Request for Leave and use of the Childcare Pretext, including but not limited to the Attorney-Expert Letter.

305. Defendant Parsons' bad faith intent in withholding, destroying, or otherwise manipulating those records was to deprive Ms. Doe of proof of the causes of action alleged herein, and related causes.

306. In the event Ms. Doe is unable to allege and/or establish a *prima facie* case for want of proof of discriminatory intent and impact, Ms. Doe has suffered, and will suffer, damages based on the loss of those causes of action.

\* \* \*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jane Doe respectfully prays that the Court grant the following relief against Defendants:

1. nominal, compensatory, and consequential damages in an amount to be determined;
2. punitive damages in an amount to be determined;
3. pre-judgment interest as allowed by law;
4. injunctive relief, pursuant to 29 U.S.C. § 2612, to the following effect:
   a. directing Defendants to expunge the Second Opinion Report from its record;
   b. directing Plaintiff to take all necessary steps to ensure that no record of Ms. Doe's FMLA application, including the Medical Certification, is located anywhere in Defendants' records other than secure medical file;
   c. directing the Defendant Board to pass a resolution creating a mental health awareness day across the District to be observed in the first 6 weeks of the academic year, and allocating $5,000 annually for that purpose from the Board's General Budget;
   d. enjoining further violation of the FMLA;

5. an award of reasonable attorney's fees, costs and disbursements, pursuant to 29 U.S.C. § 2612, *et seq.*, Connecticut common law, and the inherent powers of this Honorable Court; and

6. such other and further relief as the Court may deem just and proper.

Dated: March 26, 2021
Madison, Connecticut

Respectfully submitted,

JANE DOE,
PLAINTIFF

By: _____
Patrick J. Sweeney (ct23415)
SWEENEY LAW FIRM
77 Wall Street, Suite 1-W
Madison, Connecticut 06443
Tel.: (203) 244-9522
Fax: (203) 244-9533
Email: pjs@sweeney-law.com

# EXHIBIT A

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division



DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT

OMB Control Number: 1235-0003
Expires: 8/31/2021

## SECTION I: For Completion by the EMPLOYER

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: Nicole Damiata, Berlin BOE, fax: 860-829-0832

Employee's job title: _____ Regular work schedule: _____

Employee's essential job functions: _____

_____

Check if job description is attached: _____

## SECTION II: For Completion by the EMPLOYEE

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: _____

First                              Middle                              Last

## SECTION III: For Completion by the HEALTH CARE PROVIDER

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address: Kathleen Scheinberg 2389 Main St. Glastonbery, CT 06033

Type of practice / Medical specialty: Psychiatric nurse practitioner

Telephone: ( 860 ) 659-6559 x313   Fax:( 860 ) 659-1625

Page 1                                                              Form WH-380-E Revised May 2015

## PART A: MEDICAL FACTS

1. Approximate date condition commenced: _July 2020_

Probable duration of condition: _1-3 months_

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
_✓_ No ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:

_8/12/20 , 8/26/20 (scheduled)_

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No _✓_ Yes.

Was medication, other than over-the-counter medication, prescribed? ___ No ___ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___ No _✓_ Yes. If so, state the nature of such treatments and expected duration of treatment:

_Yes - Therapist_

2. Is the medical condition pregnancy? _✓_ No ___ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No _✓_ Yes.

If so, identify the job functions the employee is unable to perform:

_trouble focusing/concentrating, planning at this time_

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

_███████ is experiencing severe anxiety on a daily basis and frequent panic attacks that are debilitating. Symptoms include insomnia, excessive worry, restlessness, racing thoughts, fatigue and difficulty concentrating._

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No _✓_Yes.

If so, estimate the beginning and ending dates for the period of incapacity: *Current – October 2020*

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No _✓_Yes.

If so, are the treatments or the reduced number of hours of work medically necessary? ___No _✓_Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

*30-minute appt every 2-4 weeks*

Estimate the part-time or reduced work schedule the employee needs, if any: *N/A*

_____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? _✓_No ___Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups? ___ No ___Yes. If so, explain:

_____

_____

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency : _____ times per _____ week(s) _____ month(s)

Duration: _____ hours or _____ day(s) per episode

*Please reach out directly if further information is needed. (860) 944-4076.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Signature of Health Care Provider** PMH-NP    **Date** 8/12/20

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Form WH-380-E Revised May 2015