# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SARAH LARSEN,
*Plaintiff*,

v.

No. 3:21-cv-427 (JAM)

BERLIN BOARD OF EDUCATION *et al.*,
*Defendants*.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Plaintiff Sarah Larsen requested leave from her employer under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* She was ultimately granted leave to treat her mental health condition, but only after her employer—the defendant Berlin Board of Education ("the Board")—required her to submit to an invasive "second opinion" medical exam and other alleged indignities.

Larsen now brings this federal court action against the Board, the Board's Superintendent Brian Benigni, and the Board's Human Resources Director Denise Parsons for FMLA retaliation and other federal and state law violations. The defendants have moved to dismiss her amended complaint. I will deny the defendants' motion to dismiss Larsen's FMLA retaliation claim against the Board and against Parsons and Benigni in their individual capacities, but I will grant their motion to dismiss all other claims against the defendants.

## BACKGROUND

Larsen has worked since 2013 for the Board as a classroom teacher at Griswold Elementary School.[1] Larsen is also the mother of a school-age daughter who attends a public school outside of the Berlin school district ("District").[2] For more than twenty years, Larsen has

---

[1] Doc. #20 at 6–7 (¶¶ 31, 39).
[2] *Id.* at 7 (¶ 43).

1

been privately managing a mental health condition.[3] Prior to the events surrounding this case, Larsen had never disclosed her mental health condition to the Board or any other employer.[4]

Over the summer of 2020, as schools and workplaces around the country considered whether and how to reopen in light of the ongoing COVID-19 pandemic, the State of Connecticut announced that individual school districts would be responsible for making their own re-opening decisions for the 2020–21 school year.[5] On July 29, 2020, some time after the State's announcement, teachers and staff from Griswold met to discuss the District's proposed reopening plans.[6] At the meeting, Larsen and others identified themselves as Griswold classroom teachers with school-age children who attended schools outside of the District (collectively, "Non-Resident Teacher/Caregivers").[7] The Non-Resident Teacher/Caregivers expressed concern about how they would balance work and childcare responsibilities in the event that the District opted for in-person instruction while their children's home districts opted for remote instruction.[8] The Non-Resident Teacher/Caregivers were additionally concerned about how childcare-related absences would be treated under the District's leave policy, FMLA, or any other applicable policy or law.[9]

On July 30, 2020, Larsen, acting as a representative for the Non-Resident Teacher/Caregivers, called Denise Parsons, Director of Human Resources for the District, to discuss the Non-Resident Teacher/Caregivers' concerns.[10] Parsons acknowledged the questions

---

[3] *Id.* at 8 (¶ 44).
[4] *Ibid.* (¶ 46).
[5] *Ibid.* (¶ 51).
[6] *Id.* at 9 (¶ 53).
[7] *Ibid.* (¶ 54).
[8] *Ibid.* (¶ 55).
[9] *Ibid.* (¶ 56).
[10] *Id.* at 10 (¶¶ 57–58).

and concerns and indicated that she would respond with answers at a later time.[11] Larsen did not specifically request leave for childcare or any other reason during the July 30 phone call.[12]

Approximately one week later, on August 7, 2020, Larsen emailed Parsons requesting information on the process for taking leave under FMLA and indicating her intention to do so for "personal medical reasons."[13] Larsen's email was forwarded to another human resources official, who solicited some basic information from Larsen—including the purpose and anticipated dates of the leave request—and provided Larsen with a blank FMLA medical certification form to be completed by a medical provider and returned.[14] On August 12, 2020, Larsen returned a completed medical certification averring that she suffered from "severe anxiety . . . and frequent panic attacks."[15]

While Larsen's FMLA leave request was pending, Parsons became aware of other Non-Resident Teacher/Caregivers who were interested in requesting FMLA leave, and Parsons apparently became concerned about how such requests might affect the District's ability to satisfy its staffing requirements.[16] Larsen is herself aware of at least one other Non-Resident Teacher/Caregiver ("Jane Doe 3") who "asked for information about and/or requested leave of absence for childcare purposes" and "requested the FMLA paper work . . . for a personal medical condition."[17]

---

[11] *Id.* at 10–11 (¶¶ 64–65).

[12] *Id.* at 11 (¶ 66).

[13] *Ibid.* (¶ 71).

[14] *Id.* at 11–12 (¶¶ 72–75).

[15] *Id.* at 12 (¶ 79); *id.* at 50 (Ex. A).

[16] *Id.* at 14 (¶¶ 92–93).

[17] *Id.* at 13–14 & n.2 (¶¶ 86–90). Larsen elsewhere alleges that Jane Doe 3 not only requested FMLA paperwork but indeed "made a request" for FMLA leave. *See id.* at 14 (¶ 91); *see also* Doc. #31 at 20. Additionally, Larsen's amended complaint and opposition brief use a confusing array of pseudonyms to refer to certain other Non-Resident Teacher/Caregivers. Larsen variously refers to "Jane Doe," "Jane Doe 2," "Jane Doe 3," "Sarah Larsen 2," and "Sarah Larsen 3." *See* Doc. #20 at 11, 13–14, 43–44; Doc. #31 at 19–20. Construing the allegations liberally, the Court takes it as true that Sarah Larsen is aware of at least two other Non-Resident Teacher/Caregivers with similar childcare concerns ("Jane Doe 2" and "Jane Doe 3"), that both individuals "inquired about their leave rights relative to childcare issues occasion[ed] by the coronavirus health emergency," Doc. #20 at 44 (¶ 284), and that one

On August 14, 2020, Larsen and Parsons spoke over the telephone.[18] Parsons stated that she did not believe that Larsen's FMLA medical certification was legitimate; instead, Parsons believed that Larsen had contrived her medical condition as an alternative means of obtaining leave after she had previously requested and been denied leave for childcare purposes.[19] Larsen interjected that she had never formally requested leave for childcare purposes, and Parsons corrected herself and admitted that Larsen had not.[20] Still, the telephone call escalated, with Parsons allegedly yelling the following:

> I have over three hundred teachers. And I cannot have them thinking they could go get letters like [Larsen's medical certification], to not have to come back to work. I [personally] will not be approving your leave. And I will be sending it to [defendant Brian Benigni, Board Superintendent] for his review[.][21]

Shortly after the call, Parsons gave her own account of the conversation in an allegedly "sanitized and self-serving" email to Superintendent Benigni, stating that she had:

> interrupted [Larsen] abruptly, raised my voice slightly and told her that she had to realize that we are dealing with 350 teachers who are nervous about returning to school. I told her I needed to be extremely cautious as we move forward with FMLA leaves to make sure . . . the requests comply with the law.[22]

The following week, Parsons and Benigni met to discuss the August 14 telephone call and Larsen's FMLA leave request. Parsons shared her view that Larsen should submit to a second opinion medical exam by a Board-selected health care provider.[23] Under the FMLA, such an exam may be required as a condition of granting leave when the employer "has reason to doubt the validity" of a medical certification provided by the FMLA leave applicant. 29 U.S.C. §

---

individual ("Jane Doe 3") additionally requested either FMLA leave or FMLA paperwork for the same medical condition as Sarah Larsen, *id.* at 14 & n.2, 44 (¶¶ 90–91, 284).

[18] Doc. #20 at 15 (¶ 103).

[19] *Id.* at 16–17 (¶¶ 106–07, 111).

[20] *Id.* at 17 (¶ 113).

[21] *Ibid.* (¶ 114).

[22] *Id.* at 19–20 (¶¶ 135–38).

[23] *Id.* at 21 (¶ 147–48).

2613(c); *see also* 29 C.F.R. § 825.307(b). Benigni soon agreed that Larsen should be required to submit to a second opinion exam.[24]

On August 18, 2020, the Board granted Larsen provisional FMLA leave, subject to the results of a second opinion medical exam.[25] The Board selected Dr. John Bonetti, who met with Larsen on August 28, 2020.[26] During the exam, Dr. Bonetti allegedly falsely stated that Larsen had previously requested and been denied childcare leave.[27] Dr. Bonetti then "took [] Larsen through all of [her] childhood trauma" since the age of twelve.[28] The second opinion medical exam lasted one and a half hours and left Larsen "utterly traumatized and scared."[29]

On September 10, 2020, prior to receiving the results of the second opinion exam, Larsen served the Board with a "Notice of Claim and Notice to Preserve Evidence."[30] Later that same day, Parsons received a report on the results of the second opinion exam.[31] Dr. Bonetti's report confirmed that Larsen suffered from a legitimate mental health condition.[32] The report also contained extensive details regarding Larsen's personal medical history, which Larsen claims were unnecessary and beyond the scope of a proper second opinion exam.[33] With her serious health condition now corroborated, Larsen's FMLA leave remained in effect.

On December 7, 2020, Larsen filed a Freedom of Information Act ("FOIA") request for Board communications and records pertaining to her FMLA leave request.[34] In response, and

---

[24] *Id.* at 22 (¶ 152).
[25] *Id.* at 24 (¶ 164).
[26] *Id.* at 24, 26 (¶¶ 170, 181).
[27] *Id.* at 26 (¶ 183).
[28] *Id.* at 27 (¶ 189).
[29] *Ibid.* (¶¶ 191–92).
[30] *Ibid.* (¶¶ 195–96); Doc. #35 (Ex. C).
[31] Doc. #20 at 28 (¶ 203).
[32] *Id.* at 28–29 (¶ 205).
[33] *Id.* at 29–32 (¶¶ 211–30).
[34] *Id.* at 32–33 (¶¶ 231, 233, 236).

despite her prior Notice to Preserve Evidence, Larsen received no Board communications and only incomplete Board records.[35]

At some point during her leave, the Board informed Larsen that she would be required to submit to a fitness-for-duty examination, at her own expense, prior to returning to work.[36] Under the FMLA, such an exam may be required as long as it is part of an employer's "uniformly-applied policy or practice." 29 C.F.R. § 825.312(a). According to Larsen, the Board did not previously have a uniform policy or practice of requiring all similarly situated employees to obtain a fitness-for-duty certification prior to returning from FMLA leave.[37]

On March 26, 2020, Larsen filed this federal lawsuit.[38] Larsen's amended complaint alleges five claims against the Berlin Board of Education and against Human Resources Director Parsons and Superintendent Benigni in both their personal and official capacities.[39] Count One alleges retaliation in violation of the FMLA. Counts Two and Three allege Equal Protection claims in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution. Counts Four and Five allege state law claims for intentional infliction of emotional distress and for intentional spoliation of evidence. The defendants now move to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[40]

## DISCUSSION

The standard that governs a motion to dismiss under Rule 12(b)(6) is well established. A complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds

---

[35] *Id.* at 33 (¶ 234). Larsen's incomplete "personnel records," which she did obtain through her FOIA request, appear to have contained a copy of least one Board email communication pertaining to Larsen's FMLA leave request. *See id.* at 14 n.2.
[36] *Id.* at 36 (¶¶ 251–52).
[37] *Ibid.*
[38] Doc. #1.
[39] Doc. #20.
[40] Doc. #22.

to sustain a plaintiff's claims for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018). As the Supreme Court has explained, this "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In other words, a valid claim for relief must cross "the line between possibility and plausibility." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).[41]

In addition, a court need not credit conclusory or contradictory allegations. *See Hernandez v. United State*s, 939 F.3d 191, 198 (2d Cir. 2019); *Alexander v. Bd. of Educ. of City of New York*, 648 F. App'x 118, 121 (2d Cir. 2016). A complaint that engages in a threadbare recital of the elements of a cause of action but that fails to include supporting factual allegations does not establish plausible grounds for relief. *See Hernandez*, 939 F.3d at 198.

### *Official-capacity claims against Parsons and Benigni*

Larsen brings all five of her claims against the Board as well as against Human Resources Director Parsons and Superintendent Benigni in both their personal and official capacities. As a threshold matter, the defendants argue that all claims against Parsons and Benigni in their official capacities should be dismissed because they are duplicative of the claims against the Board. I agree.

"[I]n a suit against a public entity, naming officials of the public entity in their official capacities adds nothing to the suit." *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010). Accordingly, "district courts within the Second Circuit consistently dismiss as duplicative claims asserted against officials in their official capacities where the plaintiff has named the municipal entity as a defendant." *Demski v. Town of Enfield*, 2015 WL 4478401, at *3 (D. Conn. 2015)

---

[41] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

(collecting cases). Therefore, I will dismiss all official-capacity claims against Parsons and Benigni.

### FMLA Retaliation (Count One)

In Count One, Larsen alleges that the Board, Parsons, and Benigni retaliated against her for exercising her rights under FMLA. "The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, provides broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017). In addition to certain substantive rights, including an "entitlement" to twelve workweeks per year of unpaid leave, *see Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)), FMLA also "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Sista*, 445 F.3d at 174.

The Second Circuit recognizes at least two varieties of FMLA claims: interference and retaliation. *See Woods*, 864 F.3d at 166. Whereas "interference" claims allege that an employer has prevented or impeded an employee's ability to exercise her rights under FMLA, "retaliation" claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Ibid*.

To state a claim for retaliation under the FMLA, a plaintiff must allege that: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under

circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Larsen alleges FMLA violations by the Board and by Parsons and Benigni. I will consider first the claim against the Board before returning to Parsons and Benigni's individual liability.

### a.  Board Liability

In moving to dismiss Larsen's FMLA retaliation claims, the defendants argue first that she has failed to allege that she suffered any adverse employment action. I do not agree. An employee need not allege a concrete change in the terms and conditions of her employment in order to establish an adverse employment action. *See Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). Rather, for the purposes of FMLA retaliation claims, an "adverse employment action" is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *Ibid.* "Petty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims." *Id.* at 165. However, where a plaintiff alleges multiple adverse acts, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 512 (E.D.N.Y. 2018) (citing *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).

Larsen has plausibly alleged acts that could likely dissuade a reasonable worker from exercising her FMLA rights. Among other purportedly retaliatory acts, she alleges that the defendants improperly subjected her to both a second opinion medical exam as a condition of her

continued FMLA leave and a fitness-for-duty exam as a condition of returning to work.[42] She alleges that just the prospect of submitting to a mental health exam with an unfamiliar Board-selected doctor "consumed [her] with dread for seven days and sleepless nights."[43] Indeed, a mental health exam, by its very nature, involves discussion of highly personal and potentially traumatic matters, and a *second opinion* mental health exam—where the employer selects the provider and the employer has already expressed its doubts regarding the existence of the purported condition—has the potential to take on an accusatory quality. Setting aside the factual question of whether the Board was justified in requiring either exam, it is not unreasonable to think that a mental health exam by an unfamiliar and potentially skeptical physician would be likely to dissuade a similarly situated employee from exercising her FMLA rights.

To be sure, both exam requirements are within an employer's discretion. *See* 29 U.S.C. § 2613(c) (authorizing second opinion exam requirement where employer has "reason to doubt" validity of employee's initial medical certification); 29 C.F.R. § 825.312(a) (authorizing fitness-for-duty exams that are required as part of employer's "uniformly-applied policy or practice"). Indeed, several district courts in the Second Circuit have concluded that discretionary employee examination or testing requirements do not *by themselves* amount to adverse employment action for the purposes of federal employment discrimination and retaliation claims. *See, e.g.*, *Baum v. Cnty. of Rockland*, 337 F. Supp. 2d 454, 473 (S.D.N.Y. 2004), *aff'd*, 161 F. App'x 62 (2d Cir. 2005); *Figueroa v. City of New York*, 198 F. Supp. 2d 555, 568–69 (S.D.N.Y. 2002), *aff'd*, 118 F. App'x 524 (2d Cir. 2004); *Brady v. Dammer*, 573 F. Supp. 2d 712, 724 (N.D.N.Y. 2008)

---

[42] In total, Larsen alleges at least nine retaliatory acts by the defendants. See Doc. #20 at 39–40 (¶ 263). Of these, many are either conclusory or minor. Because I conclude that Larsen's allegations, taken together, plausibly plead an adverse employment action, I need not separately consider the sufficiency of each alleged adverse act.
[43] Doc. #20 at 25 (¶ 177).

("requiring an employee to submit to a [fitness-for-duty] exam does not, without more, constitute a materially adverse change").

But an authorization to *exercise* discretion does not confer on an employer the authority to *abuse* that discretion. Many of these same courts have left open the possibility that an employer may take adverse employment action if it abuses its discretion. *See, e.g.*, *Figueroa*, 198 F. Supp. 2d at 568–69 ("[t]hus, if [plaintiff] had offered evidence that the drug testing policy was manipulated such that she was disproportionately chosen for testing, such evidence could have established an adverse employment action"); *Baum*, 337 F. Supp. 2d at 474 (no adverse employment action absent evidence that employer "manipulated the law to send plaintiff to the [fitness-for-duty] exam"); *see also McNulty v. Cnty. of Warren*, 2019 WL 1080877, at *11 (N.D.N.Y. 2019) (fitness-for-duty exam, combined with involuntary medical leave pending outcome of exam, could amount to adverse employment action); *O'Toole v. Ulster Cnty.*, 2014 WL 4900776, at *10 (N.D.N.Y. 2014) (same).

Here, Larsen alleges that the Board required a second opinion mental health exam not because it had "reason to doubt" the validity of her initial medical certification but rather in order to retaliate against her for seeking to exercise her rights under FMLA. Similarly, she alleges that her fitness-for-duty exam was not part of some "uniformly-applied policy or practice" but rather a one-off exercise of the employer's discretion. In essence, Larsen alleges that the Board has manipulated the laws and regulations governing FMLA exam requirements in order to retaliate against her. Combining these allegations with her allegations on the invasiveness of the second opinion exam itself, Larsen has adequately pleaded an adverse employment action for the purposes of FMLA.

Larsen has likewise alleged enough facts to give rise to an inference that her employer's actions were the products of retaliatory intent. For the purposes of a FMLA retaliation claim, a plaintiff may establish retaliatory intent "either directly, by pleading facts [] demonstrating retaliatory animus directed against the plaintiff by the defendant, or indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence." *Lebowitz v. New York City Dep't of Educ.*, 407 F. Supp. 3d 158, 178 (E.D.N.Y. 2017).

Larsen seeks to establish retaliatory intent primarily through the words and actions of Parsons. She points in particular to their telephone call of August 14, 2020, in which Parsons allegedly yelled "I have over three hundred teachers. And I cannot have them thinking they could go get letters like this, to not have to come back to work. I . . . will not be approving your leave."[44] According to Larsen, Parsons' statements suggest that the second opinion medical exam and other retaliatory acts were performed "strategically" for the purpose of dissuading other Non-Resident Teacher/Caregivers from making valid FMLA leave requests.[45]

At the pleading stage, Parsons' alleged statements are enough to support an inference of retaliatory intent.[46] Not only Parsons' words but also her alleged tone suggest that she may have harbored an animus toward FMLA leave requests. By explicitly referencing the "over three hundred teachers" for whom she was also responsible, Parsons' comment suggests that the Board's approach to Larsen's FMLA leave request—including the imposition of a second opinion medical exam requirement—may have been motivated, at least in part, by the Board's

---

[44] *Id.* at 17 (¶ 114).

[45] *See id.* at 22 (¶¶ 154–56).

[46] Larsen also argues that an inference of retaliatory intent is supported by indirect evidence, including the close temporal proximity between her FMLA leave request and the various purported retaliatory acts. *See* Doc. #31 at 12–13. But this argument is unpersuasive, because purportedly retaliatory acts like second opinion medical exams and fitness-for-duty exams must *necessarily* occur in close temporal proximity to a FMLA leave request.

short-term teacher staffing challenges. Thus, it is reasonable to infer that Parsons may have

intended to dissuade similarly situated employees from exercising their FMLA leave rights. *See*

*Mancini v. Accredo Health Grp. Inc.*, 411 F. Supp. 3d 243, 256 (D. Conn. 2019) (remark that

employee was not being a "team player" could "suggest animus concerning FMLA leave,

because [employer's] remarks and conduct were triggered by FMLA leave requests").

      I conclude that Larsen has plausibly alleged the required elements for a FMLA retaliation

claim against the Board. I turn next to the liability of the individual defendants.

      *b.   Parson and Benigni's Individual Liability*

      An individual may be held liable under the FMLA only if she is an "employer," which is

defined as encompassing "any person who acts, directly or indirectly, in the interest of an

employer to any of the employees of such employer.'" *Graziadio v. Culinary Inst. of Am.*, 817

F.3d 415, 422 (2d Cir. 2016) (quoting  29 U.S.C. § 2611(4)(A)(ii)(I)). "Because a public agency

is clearly an employer, and because the employees of public agencies 'act[ ], directly or

indirectly, in the interest of' the public agencies for which they work," district courts in the

Second Circuit have routinely concluded that public employees can qualify as "employers" under

the FMLA. *See Burns v. Rovella*, 2019 WL 13123530, at *9 (D. Conn. 2019); *see also Smith v.*

*Westchester Cnty.*, 769 F. Supp. 2d 448, 474 (S.D.N.Y. 2011) ("[A] fair reading of the plain

language of the statute does not exclude public employees from individual liability.").

      To determine whether an individual-capacity defendant qualifies as an "employer" for the

purposes of FMLA liability, the Second Circuit applies the "economic reality" test, which directs

courts to ask "whether the alleged employer possessed the power to control the worker in

question, with an eye to the economic reality presented by the facts of each case." *Graziado*, 817

F.3d at 422. Among the facts to be considered are "whether the alleged employer (1) had the

power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Ibid*. At the motion to dismiss stage, a plaintiff "need not allege sufficient facts to satisfy the economic reality test; instead, [they] must simply plead that the proposed Individual Defendants had substantial control over the aspects of employment alleged to have been violated." *Ziccarelli v. NYU Hosps. Ctr.*, 247 F. Supp. 3d 438, 446 (S.D.N.Y. 2017).

Additionally, a plaintiff bringing a FMLA claim against an individual defendant must plausibly allege that the proposed defendant had some personal involvement in the alleged FMLA violation. *See Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 150 (D. Conn. 2014) ("an individual is subject to FMLA liability when he or she exercises supervisory authority over the complaining employee *and* was responsible in whole or part for the alleged violation") (emphasis added). Thus, while individuals with "involvement in [the] decisions which allegedly violated [a plaintiff's] FMLA rights" will face liability, individuals who did not "actually exercise[] any of [their] authority in relation to [the plaintiff's] FMLA rights" will not. *Id.* at 150–51.

With respect to defendant Parsons, Larsen has plausibly alleged that Parsons exercised sufficient supervisory control to bring her within the definition of a covered "employer" under FMLA. As the Board's Director of Human Resources, it seems that Parsons was principally responsible for managing teachers and staff, including through the consideration of FMLA leave requests. Parsons was also personally involved with the alleged violation of Larsen's FMLA rights. Larsen alleges that it was Parsons who pushed most forcefully for the requirement of a second opinion medical exam, and it is Parsons' comments that Larsen uses as direct evidence of retaliatory intent.

The allegations against Benigni are fewer but still sufficient. As the Board Superintendent, he too exercised sufficient supervisory control to qualify as an "employer" under FMLA. It appears from the complaint, for example, that he had the final authority to approve or deny FMLA leave requests. In Larsen's case, Parsons sent the FMLA request to Benigni "for his review," and Parsons later consulted with Benigni on the requirement for a second opinion medical exam.[47] Further, it can be reasonably inferred from the alleged email exchange and discussions between Parsons and Benigni that Benigni was aware of Parsons' allegedly retaliatory motives.

I conclude that Larsen has adequately stated a claim against both Parsons and Benigni in their individual capacities. Accordingly, I will deny the motion to dismiss with respect to Larsen's FMLA retaliation claims against the Board and against Parsons and Benigni in their individual capacities.

### Equal Protection Claims (Counts Two and Three)

In Count Two, Larsen alleges that the individual defendants violated the Equal Protection Clause by singling her out for selective treatment. Larsen further alleges that her selective treatment was motivated by the defendants' malice and subjective ill will toward her. In Count Three, Larsen alleges a claim for *Monell* liability against the Board on the theory that the defendants' Equal Protection violations were part of a municipal policy, practice, or procedure. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

There are two "distinct pathways for proving a non-class-based Equal Protection violation." *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019). First, under a selective treatment theory, a plaintiff must show that "(1) the [the plaintiff], compared with others

---

[47] Doc. #20 at 17, 19–21 (¶¶ 114, 135–141, 148).

similarly situated, [was] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as . . . malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980). The Supreme Court has also "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges [1] that she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*). Here, Larsen is careful to emphasize that she has alleged only a selective treatment claim, not a class-of-one claim.[48]

For a selective treatment claim, a plaintiff must first allege at least one instance to show that she was differently treated relative to some similarly situated comparator. *See Hu*, 927 F.3d at 101. While the plaintiff need not allege the "extremely high" degree of similarity required for a class-of-one claim, *Hu*, 927 F.3d at 93, she must at least demonstrate a "reasonably close resemblance" between the plaintiff's and comparator's circumstances, *ibid*. It is enough for a plaintiff to show that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* at 96. Additionally, while courts are "cautioned against deciding whether two comparators are similarly situated on a motion to dismiss," *id*. at 97, "a general allegation that plaintiffs were treated differently from those similarly situated is insufficient to survive a motion to dismiss." *Servidio Landscaping, LLC v. City of Stamford*, 2020 WL 7246441, at *3 (D. Conn. 2020) (citing *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010)).

Larsen does not allege enough facts to suggest that she was similarly situated to any proposed comparator, let alone that she was differently treated from any comparator. Larsen's

---

[48] *See id.* at 42 (¶ 270); Doc. #31 at 16.

principal proposed comparator is Jane Doe 3, who allegedly inquired about childcare leave

options before requesting FMLA leave.[49] But the allegation that Jane Doe 3 formally requested

FMLA leave is undercut by Larsen's repeated allegation that Jane Doe 3 merely requested

FMLA paperwork. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)

(dismissal appropriate where a plaintiff's "attenuated allegations . . . are contradicted . . . by

more specific allegations in the Complaint").[50] For a claim predicated on the defendants'

selective treatment of FMLA leave requests, an individual who has merely requested FMLA

paperwork is not similarly situated in all material respects to a plaintiff who has requested and

taken FMLA leave.

Moreover, the same contradiction casts significant doubt on Larsen's conclusory

allegation that Jane Doe 3 was treated more favorably than her. She alleges that Jane Doe 3,

unlike Larsen herself, was never asked to withdraw her FMLA leave request or submit to a

second opinion medical exam.[51] But neither treatment would be *possible* until after Jane Doe 3

had formally requested FMLA leave. In short, the complaint's general allegations—themselves

contradicted by more specific allegations—do not plausibly allege that Larsen was treated less

favorably than a similarly situated Jane Doe 3.

None of Larsen's other proposed comparators are sufficient. She proposes five broad

"comparator classes"—including *all* District staff, *all* Non-Resident Teacher/Caregivers, *all*

teachers at Griswold with school-age children, *all* Griswold teachers for her same grade level,

---

[49] Doc. #20 at 44 (¶ 284).

[50] Paragraph 91 of Larsen's amended complaint is especially telling. In a footnote, Larsen alleges that through her FOIA request she obtained an email stating that Jane Doe 3 "requested the FMLA paper work from [Board officials] for a personal medical condition (same as [Larsen])." *See* Doc. #20 at 14 n.2. But in paragraph 91, on the very same page of the complaint, Larsen selectively quotes from the alleged email and substitutes her own words—that Jane Doe 3 "made a request for FMLA leave . . ."—for the verbatim words of the email—that Jane Doe 3 "requested the FMLA paper work . . .". *Compare ibid. with id.* at 14 (¶ 91).

[51] *Ibid.* (¶ 285).

and *all* District staff who requested FMLA leave based upon a non-obvious medical condition—but none is alleged with sufficient specificity to evaluate its similarity to Larsen's very unique circumstances.

In any case, even if Larsen could identify a similarly situated comparator, she nonetheless fails to plausibly allege the second element of her claim: impermissible motivation. *See Hu*, 927 F.3d at 91. "Impermissible considerations" include "discrimination on the basis of a defendant's personal malice or ill will towards a plaintiff." *Ibid*. Importantly though, not all hostile interactions with a government official suggest that the official was motivated by personal malice. Where the official in question is motivated by some legitimate government objective, the official's actions are definitionally not malicious.

The Second Circuit's opinion in *Bizzarro v. Miranda*, 394 F.3d 82 (2d Cir. 2005), is instructive. There, a pair of corrections officers brought Equal Protection claims against superior officials who disciplined the plaintiffs after they had refused to assist the Department of Corrections in an internal investigation. As proof that the defendants were motivated by malice, the plaintiffs showed that one of the defendants had become "enraged, engulfed with anger, screaming at [plaintiff]." *Id.* at 87. Despite crediting the evidence that the defendant had grown angry at the plaintiffs' refusal to assist in the investigation, the Second Circuit ruled that "[s]uch a motivation is not impermissible in the sense required by *LeClair*." *Ibid.* The court explained: "[t]he branch of equal protection law that protects individuals from unequal treatment motivated by 'malicious or bad faith intent to injure' provides protection from adverse governmental action that is *not motivated by legitimate governmental objectives*." *Ibid.* (emphasis added). "If the motivation to punish is to secure compliance with agency objectives, then by definition the

motivation is not spite, or malice, or a desire to 'get' someone for reasons wholly unrelated to any legitimate state objective." *Ibid*.

Here, Larsen's allegations make clear that the defendants' hostile behavior was, at worst, motivated by a desire to advance legitimate District objectives. Larsen's primary allegations of malice pertain to the "verbal abuse" she endured though her conversation of August 14, 2020 with Parsons, when Parsons yelled "I have over three hundred teachers. And I cannot have them thinking they could go get letters like this, to not have to come back to work."[52] But Parsons' words, however offensive, make clear that she was motivated by a desire to satisfy the District's teacher staffing goals. Parsons apparently perceived Larsen's legitimate FMLA leave request as an impediment to achieving those goals. To the extent that Parsons or others subjected Larsen's FMLA request to undue scrutiny in an effort to dissuade other teachers from submitting similar requests, such behavior may give rise to a claim for FMLA retaliation, but it does not demonstrate the type of "malicious or bad faith intent to injure" required for a selective treatment equal protection claim.

Accordingly, because Larsen fails to plausibly allege either that she was differently treated from similarly situated comparators or that the defendants' actions were motivated by malice, I will dismiss Larsen's Equal Protection claim (Count Two). Further, because it is predicated on the same Equal Protection theory, I will dismiss Larsen's *Monell* liability claim against the Board (Count Three) for lack of a predicate equal protection violation.

### *Intentional Infliction of Emotional Distress (Count Four)*

---

[52] Doc. #20 at 17 (¶ 114).

In Count Four, Larsen alleges state law claims against all defendants for the intentional infliction of emotional distress. As a threshold matter, the defendants argue first that Larsen's claim against the Board is barred by governmental immunity.[53] I agree.

Under Connecticut law, municipal governments may not be held liable for the intentional torts of their employees. *See* Conn. Genn. Stat. § 52-557n(a)(2)(A). It is well established that Connecticut's grant of governmental immunity extends to claims for intentional infliction of emotional distress. *See Pane v. City of Danbury*, 267 Conn. 669, 685–86 (2004), *overruled on other grounds by Grady v. Town of Somers*, 294 Conn. 324 (2009). Accordingly, I will dismiss Larsen's claim for intentional infliction of emotional distress against the Board.

Turning to Larsen's claims against Parsons and Benigni, a plaintiff asserting a claim for intentional infliction of emotional distress must allege four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)).

"In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous. An employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." *Id.* at 195. "In addition to routine employment actions, Connecticut courts hold that insults, verbal taunts,

---

[53] In her briefing on the defendants' motion to dismiss, Larsen appears to withdraw her state law claims against the Board. *See* Doc. #31 at 26. Because it is not altogether clear whether she intends to voluntarily dismiss Counts Four and Five against the Board, I will address those claims in this ruling.

threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings do not support a claim for intentional infliction of emotional distress." *Ibid*.

Larsen's allegations fall well short of the "extreme and outrageous" behavior required to sustain a claim for intentional infliction of emotional distress. Larsen's most serious allegations concern "verbal abuse" by defendant Parsons and disingenuous requirements for a second opinion and fitness-for-duty exam. The verbal abuse may suggest bad manners, but it does not rise to the level to support a claim for intentional infliction of emotional distress. And whether or not the second opinion and fitness-for-duty exam requirements were improperly motivated, they no doubt qualify as routine employment actions. Consequently, these acts do not suffice to sustain a claim for intentional infliction of emotional distress. *See Miner*, 126 F. Supp. 2d at 195. Accordingly, I will grant the motion to dismiss the claim for intentional infliction of emotional distress as alleged in Count Four.

### Spoliation (Count Five)

Finally, in Count Five, Larsen alleges state law claims against all defendants for intentional spoliation of evidence. To the extent that Larsen seeks to hold the Board itself liable, Larsen's intentional spoliation claim is barred by governmental immunity for the same reasons I have discussed above with respect to her claim for intentional infliction of emotional distress. *See Avoletta v. City of Torrington*, 133 Conn. App. 215, 221–26 (2012) ("Intentional spoliation of evidence and fraudulent concealment are acts encompassed within [Conn. Gen. Stat.] § 52–557n (a)(2)(A), and, under our case law, a municipality cannot be held liable for the intentional torts of its employees.").

Turning to the claims against the individual defendants, to state a claim for intentional spoliation of evidence under Connecticut law, the plaintiff must allege "(1) the defendant's knowledge of a pending or impending civil action involving the plaintiff; (2) the defendant's destruction of evidence; (3) in bad faith, that is, with intent to deprive the plaintiff of his cause of action; (4) the plaintiff's inability to establish a prima facie case without the spoliated evidence; and (5) damages." *Traylor v. Hammond*, 94 F. Supp. 3d 203, 222 (D. Conn. 2015) (citing *Rizzuto v. Davidson Ladders, Inc.*, 280 Conn. 225, 244–45 (2006)). Additionally, a plaintiff pleading intentional spoliation of evidence must allege that the destroyed evidence was "vital" to her ability to prevail on her claims, and she must allege with specificity which claims might have been litigated but for the spoliation of evidence. *Ibid.*

Here, Larsen primarily alleges that the defendants "withheld or destroyed" two documents or sets of documents.[54] The first was an alleged letter (the "Attorney-Expert Letter") from a Board attorney to Dr. Bonetti, who performed Larsen's second opinion medical exam. The second set of documents, which Larsen raises only in her memorandum in opposition to the defendants' motion to dismiss, consists of Dr. Bonetti's notes from the second opinion medical exam.[55] She additionally alleges that the defendants "withheld or destroyed" various other unspecified "Board[] records of communications, notes and memoranda."[56]

The defendants argue that Larsen's intentional spoliation claims are speculative and conclusory. I agree. Larsen herself appears to acknowledge that she does not know whether the documents she seeks have been destroyed or merely withheld.[57] She argues, however, that the

---

[54] *See* Doc. #20 at 34, 47 (¶¶ 241, 305); Doc. #31

[55] Doc. #32 at 11 (¶¶ 38–40).

[56] Doc. #20 at 47 (¶¶ 304–05).

[57] The exception is Dr. Bonetti's notes, which Larsen avers Dr. Bonetti intentionally destroyed. But Larsen herself suggests that it was Dr. Bonetti's general practice to destroy exam notes after he finished writing a report. Here, Dr. Bonetti wrote his report on Larsen's second opinion exam prior to receiving Larsen's "Notice of Claim." Thus, Larsen's own averments undercut the notion that Dr. Bonetti—who is not even a party to this case—intentionally

defendants' failure to produce the documents in response to her FOIA request permits the inference that the defendants intentionally destroyed documents.[58] While there may be some circumstances in which a failure to respond to a FOIA request will permit an inference of spoliation, *see Baltas v. Rivera*, 2019 WL 3944435, at *9 (D. Conn. 2019) ("the lack of response to his preservation requests likely means that the [video] tapes were re-used"), the present circumstances do not reasonably permit such an inference. Government agencies routinely fail to respond to FOIA requests for written materials. That alone does not suggest that the agency destroyed the requested materials, much less that it did so with a bad faith intent to injure the requesting party. Without considering whether she is entitled to any relief under Connecticut's FOIA law, Larsen's allegations do not state a claim for intentional spoliation of evidence.

In addition, even if I credit that the documents were destroyed and assume that the defendants acted in bad faith, Larsen fails to establish that any of the evidence would be vital to her claims. She alleges that both the Attorney-Expert Letter and Dr. Bonetti's notes would establish that the defendants sought to justify the requirement of a second opinion medical exam based on the false premise that Larsen had formally requested childcare leave prior to applying for FMLA leave (the "false childcare pretext"), whereas, in fact, she merely *inquired* about the childcare leave. But such a distinction is irrelevant. What matters to Larsen's FMLA claim is whether the defendants were motivated by an impermissible intent to dissuade Larsen and others from exercising their FMLA rights, and Larsen has various alternative means of establishing that—including through depositions and her own oral testimony. *See Caro v. Weintraub*, 2010 WL 4514273, at *7 (D. Conn. 2010) (dismissing intentional spoliation claims where plaintiff has access to alternative sources of proof), *aff'd on recon.*, 2011 WL 13234162 (D. Conn. 2011).

---

spoliated evidence.
[58] *See* Doc. #31 at 25–26.

Finally, even assuming that Board officials intentionally destroyed evidence that was vital to Larsen's claims, she does not allege that Parsons and Benigni were personally involved or even had knowledge of the alleged spoliation. *See Nuzzo v. Devine*, 2022 WL 92563, at *3 (D. Conn. 2022) (denying relief from judgment based on alleged spoliation of evidence where "[plaintiff] has not shown that the defendants themselves took any steps to destroy this evidence"). The documents at the center of her claims—the Attorney-Expert Letter and Dr. Bonetti's notes—were created and presumably controlled by individuals other than Parsons and Benigni, and Larsen does not explain how Parsons and Benigni were personally responsible for the destruction of either set of documents.

In sum, Larsen's claim against the Board for intentional spoliation of evidence is barred by governmental immunity, and against Parsons and Benigni she has failed to state a claim. Accordingly, I will dismiss the intentional spoliation of evidence claims as alleged in Count Five of the amended complaint.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part the motion to dismiss. The Court GRANTS the motion to dismiss all claims as against defendants Parsons and Benigni in their official capacities. The Court GRANTS the motion to dismiss Counts Two, Three, Four, and Five. The Court DENIES the motion to dismiss Count One as against the Board and defendants Parsons and Benigni in their individual capacities.

It is so ordered.

Dated at New Haven this 28th day of February 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge